STATE OF LOUISIANA

VERSUS

LAWRENCE SLY

NO. 23-KA-60

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-6813, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING

November 02, 2023

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Stephen J. Windhorst

<u>**AFFIRMED**</u>
    **SMC**
    **MEJ**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Juliet L. Clark

COUNSEL FOR DEFENDANT/APPELLANT,
LAWRENCE SLY
    Carol Anne Kolinchak

**CHEHARDY, C.J.**

Defendant, Lawrence Sly, appeals his conviction and sentence for second degree murder. On appeal, he argues that the evidence adduced at trial was insufficient to sustain the jury's guilty verdict because the evidence supported a finding that Sly was acting in self-defense and, thus, his actions were justifiable. Further, Sly argues that his sentence is excessive. After thorough review and consideration of the record and applicable law, for the reasons that follow, we affirm Sly's conviction and sentence.

**PROCEDURAL HISTORY**

On June 18, 2020, a Jefferson Parish Grand Jury indicted defendant, Lawrence Sly ("Sly"), with the second degree murder of Garland Webber ("Webber"), in violation of La. R.S. 14:30.1. Sly was arraigned on June 19, 2020, and pleaded not guilty. On June 19, 2020, defense counsel filed omnibus and pre-trial motions, including motions for discovery and inspection, for exculpatory evidence for Sly, and to suppress confession, physical evidence, and identification. A motion hearing was held on October 1, 2020, regarding Sly's motion to suppress statement, which the trial court denied.[1]

Thereafter, defense counsel filed a motion for supplemental discovery requesting the State to provide medical and prescription information relating to Webber. The district court originally ordered the State to produce the information, to which the State responded by filing a motion to quash. On February 10, 2021, the district court denied Sly's motion for supplemental discovery and granted the State's motion to quash. On July 21, 2021, defense counsel filed a second motion for discovery of Webber's medical records, which the trial court denied on August

---

[1] The appellate record reflects that Sly's motion to suppress the identification and physical evidence was not argued or ruled upon. If a defendant does not object to the district court's failure to rule on a motion prior to trial, the motion is considered waived. *State v. Ruffin*, 02-798 (La. App. 5 Cir. 12/30/02), 836 So.2d 625, 636, *writ denied sub nom. State ex rel. Ruffin v. State*, 03-3473 (La. 12/10/04), 888 So.2d 831.

17, 2021. Sly filed a writ application seeking review of the district court's ruling, which this Court denied. *Sly v. State*, 21-K-648 (La. App. 5 Cir. 11/9/21) (unpublished writ disposition). The Louisiana Supreme Court denied writs. *Sly v. State*, 21-1849 (La. 2/15/22), 332 So.3d 1180.

Trial commenced before a twelve-person jury on June 14, 2022. On July 17, 2022, a unanimous jury found Sly guilty as charged. On July 8, 2022, Sly filed a motion for new trial and for post-verdict judgment of acquittal, which was denied on July 11, 2022. Three impact statements were presented that day. Sly was sentenced on July 14, 2022, to life imprisonment without benefit of parole, probation, or suspension of sentence. Sly filed a motion for appeal on July 18, 2022, which was granted on July 20, 2022. Sly's motion to reconsider sentence was filed on July 27, 2022, and denied the same day.[2] This timely appeal ensued.

**ASSIGNMENTS OF ERROR**

On appeal, Sly raises fifteen assignments of error:

1. The evidence adduced at trial was insufficient to prove that a crime had occurred.

2. Mr. Sly's right to confront and cross-examine the witnesses against him was violated when the state introduced a 911 call containing testimonial statements and incorrectly attributed the call to Damon Payne.

3. Mr. Sly was denied his right to present a defense.

4. The State failed to disclose material, relevant impeachment evidence and allowed false testimony to go uncorrected. (Brady Claim)

5. Jury Instruction errors mandate a new trial.

6. The State impermissibly prejudiced the jury when it used the facts of the case to voir dire jurors.

7. Mr. Sly was represented by conflicted counsel.

8. Mr. Sly was denied his right to trial by a jury of his peers.

---

[2]     By virtue of La. C.Cr.P. art. 916(3), the district court retained jurisdiction to take action on Sly's properly filed motion to reconsider sentence after the order of appeal was entered. *See State v. Day*, 14-708 (La. App. 3 Cir. 12/23/14), 158 So.3d 120, 135.

9. The improper introduction of victim impact evidence mandates a new trial.

10. Mr. Sly was denied his right to a fair trial when the State was permitted to introduce highly prejudicial, inadmissible hearsay testimony.

11. Mr. Sly's sentence is cruel, unusual, and excessive in violation of Article I, Section 20 of the Louisiana Constitution and the Eighth Amendment to the United States Constitution.

12. Mr. Sly's statement was not knowing, intelligent and voluntary and should have been suppressed.

13. Mr. Sly has been denied his right to a complete appellate record.

14. Mr. Sly was denied his right to a fair trial presided over by an impartial judge.

15. The cumulative impact of these errors mandates a new trial.

**FACTS**

Sly and the victim, Garland Webber, were next-door neighbors for "years" and shared an alley between their respective homes. While they were initially friends, the relationship deteriorated over time. The police were summoned to their residences on four separate occasions between October 2015 and May 2018; namely, October 3, 2015, October 30, 2015, October 6, 2017, and May 27, 2018. The first three incidents involved Webber possessing a firearm while on his property outside of his home. The May 27, 2018 incident involved a physical altercation between the two neighbors that Sly claims left him blind in one eye. Ultimately, on November 11, 2019, Sly shot Webber six times resulting in Webber's demise. According to Sly, he acted in self-defense.

### Emergency 9-1-1 Calls

Three 9-1-1 calls made on November 11, 2019, were played for the jury.[3] In one call, a male caller relayed that a shooting had occurred in front of his residence and that there were "multiple gunshots and a guy down" on the sidewalk. He

---

[3] The parties stipulated that if called to testify, the custodian of records for the Jefferson Parish communications department, Nancy Weber Clary, would testify regarding the recording and identification of 9-1-1 calls. A 9-1-1 recording and an associated call action detail were offered by the State and admitted into evidence.

stated the person sustained multiple gunshot wounds and was not breathing. The caller, who did not identify himself or anyone else, indicated that saw the shooting, but did not want to say anything, nor did he want to speak to an officer. On the recording, the caller can be heard asking whether anyone knew "any kind of life-saving," and was then interrupted by another male voice stating, "He is dead."[4] The caller is heard asking that person whether the victim had a gun, and was told "he was running away." The caller reiterated that he saw the entire thing.

On a second call, a female stated that someone shot and killed a man. She claimed that she heard six or seven gunshots, but did not see anything. A third caller, also a female, relayed that the shooter was black and wearing a grey hat and dark clothing. She stated she heard the shooter say that he was going to go to jail.

### Damon Payne

Payne was called by the State to testify at trial. While he admitted making a 9-1-1 call on November 11, 2019, regarding a shooting, and initially admitted that it was his voice heard on the 9-1-1 call, as the 9-1-1 tape was played to the jury, he recanted and insisted that it was not. Payne identified the person that was shot and acknowledged that he called Webber's daughter right after the shooting. He stated he did not recall telling the 9-1-1 operator that he did not want to speak to the officers, and denied that he was an eyewitness to the shooting. Payne conceded that he did not respond to the various attempts made by the district attorney's office to speak with him about the shooting.

### Sergeant Jeffrey Melle

Sergeant Melle, a Jefferson Parish Sheriff's Office ("JPSO") employee for thirteen years, was the first officer to arrive on the scene in response to a 9-1-1 call reporting that a person had been shot in the 3800 block of Chinkapin Street in

---

[4] Portions of the caller's statements, and most of the comments made the person to whom the caller was speaking to at the scene, are inaudible or indiscernible.

Harvey, Louisiana. Sgt. Melle observed a male lying face down across the sidewalk suffering from multiple gunshot wounds to his back and head. He immediately attempted to render aid, but to no avail. After confirming that the victim showed no signs of life, Sgt. Melle began securing the scene. No firearm was discovered on or near the victim.

Sgt. Melle stated that when he arrived on the scene there were multiple people present, including Sly, who voluntarily approached him and declared that he shot Webber. Sgt. Melle immediately placed Sly in handcuffs, advised him of his *Miranda*[5] rights from memory, which Sly indicated he understood. Sgt. Melle informed Sly that he was being detained and placed him in the backseat of his unit. Sly advised Sgt. Melle that the gun he used to shoot Webber was on the hood of a vehicle located across the street from Webber's body. Sgt. Melle recovered the weapon, which had a live round in the chamber, "rendered it safe," and placed it in a pocket of his cargo pants.[6]

Sgt. Melle testified that once other units arrived on the scene, he elected to transfer Sly to another unit that had a cage. He stated that Sly did not appear to have sustained any injuries nor did he observe any signs of a struggle. Sly was *Mirandized* a second time, after which he provided a more detailed statement to Sgt. Melle. Sly told him that he and Webber lived next door to one another, had experienced previous altercations involving violence, and that he was scared of Webber. Sly recounted that earlier that evening, he went to the shared alley to take out his garbage, when he saw Webber and words were exchanged. Sly related that Webber told him something, which he perceived as threatening, so he shot Webber. Sgt. Melle testified that, while Sly did state that Webber had previously instigated arguments and threatened him with a rifle, Sly did not tell him that he

---

[5]     *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[6]     Sergeant Melle testified that he also recovered two magazines, each capable of holding sixteen bullets, and that there were bullets remaining in each magazine.

thought Webber had a weapon or that he had been reaching for a weapon when Sly shot him. Sgt. Melle stated that no other witnesses came forward, and that when homicide detectives responded to the scene, they took over the investigation.

### *Detective Donald Zanotelli*

Detective Zanotelli, while employed by the JPSO in the Homicide Section, was the lead investigator in Webber's murder. He testified that, upon arriving on the scene in the 3800 block of Chinkapin Street, he observed Webber's body on the ground in a prone position, face down.[7] He noticed the area was secured in yellow crime tape, and that family members and neighbors were present. Sgt. Melle advised him that Sly was being detained on the scene, and that a firearm and seven RB brand 9mm fire cartridge shell casings were recovered. At Det. Zanotelli's direction, Sly was transported by Det. Anthony Buttone to the JPSO Investigation Bureau while Det. Zanotelli remained on the scene.

At trial, Det. Zanotelli identified and described several photographs of Webber taken at the scene, one of which showed a phone next to Webber's body, but no weapons on or near it. Another showed Webber's body on the ground located across the street from his residence. Det. Zanotelli testified that while the fatal shot was to the right side of Webber's head, Webber also sustained gunshot wounds to both of his knees, one to the right side of his back, and one to the left side of his ear, which exited his body from the front, ricocheted off the concrete, and then struck Webber's left cheek.

Det. Zanotelli identified and testified regarding photographs taken of the scene, including photographs of fired cartridge casings, Webber's keys in the driveway, and Webber's residence leading to a bedroom where a surveillance camera DVR was located. Det. Zanotelli stated most of the recovered cartridge casings were located near Sly's trash can, and one was discovered in the trash can.

---

[7] Webber's cell phone was found on the ground next to his body.

A search warrant for Webber's residence was obtained by Sgt. Thomas Guy and executed by Det. Zanotelli. Pursuant to the warrant, he seized the surveillance camera DVR (the monitor and DVR underneath it). Det. Zanotelli testified that, with Webber's son, he viewed footage which showed Webber arriving home and parking in his driveway, exiting his vehicle, and going to his trashcan. At this point, "the system goes distorted," and was not discernable. When it came back up for viewing, the shooting had already occurred, and Webber was seen in a prone position across the street. Webber's son advised Det. Zanotelli that no one had accessed the surveillance system. Thereafter, Det. Zanotelli submitted the DVR system to the JPSO crime lab for examination by the Digital Forensic Unit ("DFU"). The DFU was unable to retrieve any viewable footage from the system, including the portion previously viewed by Det. Zanotelli while at the scene.

Det. Zanotelli also executed a search warrant for Sly's residence, where a Smith & Wesson 9mm gun box was seized. Det. Zanotelli identified the Smith & Wesson 9mm handgun recovered from the scene and testified that it was submitted to the crime lab as evidence. Det. Zanotelli identified two 16-round Smith & Wesson 9mm magazines—one recovered from the handgun, and the other recovered from the hood of Sly's vehicle. Each magazine was capable of holding sixteen bullets. When recovered, one magazine had eight live rounds remaining, and the other contained ten. Det. Zanotelli acknowledged that Sgt. Melle had previously recovered a live round in the chamber of the handgun.

Det. Zanotelli testified that no eyewitnesses came forward. Sly was arrested on the evening of the shooting for manslaughter. At that time, Det. Zanotelli did not have the results of the ballistic evidence that had been previously submitted to the crime lab. The following morning, Det. Zanetolli attended Webber's autopsy

where "key evidence"—lead bullet fragments—was obtained from the body.[8] Det. Zanotelli testified that, based on the evidence recovered from the scene, he determined that there were two separate "engagement of gunfire" locations. At the first, five fired cartridge shells were recovered, and at the second, located across the street, two fired cartridge casings were recovered. Det. Zanotelli claimed that while Sly did express that he believed the threat of retaliation was imminent, Sly did not say that when he fired those last two rounds that he feared for his life *at that moment*.

Det. Zanotelli testified that he spoke to Webber's wife, Darlene, at the scene, but did not take a formal statement. During his investigation, Det. Zanotelli was made aware of four prior incidents between Webber and Sly where the police were summoned—two in October of 2015, one in October of 2017 (resulting in Webber's arrest and, ultimately a guilty plea), and one in May of 2018. Det. Zanotelli denied that he was told that Darlene claimed the October 2017 incident did not actually occur, but stated that even if he had such information, it would not have changed or impacted his investigation of the shooting.

### Detective Anthony Buttone

Approximately an hour after the shooting, when Sly was transported by police from the scene to the JPSO criminal investigation bureau, he was interviewed by Det. Buttone of JPSO's homicide division. Det. Buttone advised Sly of his *Miranda* rights and had Sly sign and date a "rights of arrestee" form, which was introduced into evidence, indicating Sly had read his rights, waived them, and was agreeing to talk with law enforcement without a lawyer present. The audio and video recorded interview of Sly conducted by Det. Buttone and Det.

---

[8]     Det. Zanotelli testified that during Webber's autopsy, it was discovered that one of the last two gunshot wounds were to Webber's ear. He explained that when Sly pursued Webber across the street, two gunshots had already "blown out Mr. Webber's knees. So that would have rendered him pretty much disabled and motionless at that time. So he couldn't do nothing."

Kristian Fricke was published to the jury. A complete transcript of the interview was admitted into evidence at trial. During the interview, Sly relayed various incidents that occurred between himself and Webber since 2015 that ultimately led to the November 11, 2019 homicide. Sly claimed that Webber repeatedly pulled weapons on him and his family, and that he kept "pushing, pushing, and pushing" Sly, all of which culminated in the shooting.

Sly explained that, on the evening of the shooting, he and his wife were planning to go to the AT&T store to take care of some business. At approximately 5:30 p.m., Sly stated he exited the house and noticed that Webber's wife's car was not in the Webbers' driveway suggesting to him that Webber was home alone. Believing he might have trouble with Webber, Sly went back inside and grabbed his gun and two magazines, which he claimed were "loaded all the way up."[9] He put one magazine into the gun (but claimed there was no round in the chamber), and one in his pocket, and then placed the gun into his left waistband. After, he returned outside to throw some trash into the trash can near the curb. Sly initially alluded that Webber saw him on his security cameras and came outside. Sly later claimed that when came outside, he heard the door on Webber's truck open saw Webber getting out of his truck. Webber stood in between the two trucks parked in his driveway, and began cursing Sly, saying, "You p***y mother f****r, I told you it ain't over … p***y n***r, you know, I told you that whenever the f**k you ready, I'm ready, you let me know." Sly had told Det. Buttone that he was already armed with a handgun and extra magazine and responded, "Well, I'm ready now."[10]

Sly said Webber then came out from in between the trucks and charged towards him, and it looked like Webber was "reaching [across his body] for

---

[9]     Sly admitted to Detective Buttone that the gun found at the scene was the one he fired at Webber.

[10]    In the interview, Sly denied that Webber had previously threatened him that day or that they had any earlier interaction on the day of the shooting.

something" on his right side. Sly claimed that, not knowing what Webber might have on his person, but expecting that he had a weapon since he had pulled a rifle on Sly in the past and was no longer on probation, when Webber "reached for something," Sly responded by using his right hand to retrieve his gun from his left waistband, cocked it, and started shooting at Webber. Sly could not recall how many shots he fired at Webber, but stated that after the initial shots, Webber "would not go down" and continued to "charge" him "in a threatening manner" (as if he was attempting to overtake Sly to take his gun away), so Sly emptied one magazine, threw it on the ground, and inserted the other. Sly claimed that after he hit Webber a couple of times, Webber went down, but got back up and "started backing up" towards the street, but was "facing [Sly] the whole time."[11] Det. Buttone testified that this description was inconsistent with information he learned during the course of the interview indicating that Webber had sustained two gunshot wounds to his back.

Sly explained that he continued to advance on Webber while he was down on the ground because Webber continued to "come at him," and he thought Webber "has something on his person and Sly was trying his "best to keep [Webber] from getting to what he might have." When challenged by Det. Buttone and Det. Fricke as to why he continued to shoot Webber once Webber was down on the ground, Sly explained that "I should have stopped. Okay. But I didn't want him to come back on me. … I didn't want to wound him to wheres he go to the hospital, and then he come back on me. … I wasn't gonna let him hurt me or mine." Sly stated he was "fed up" and "had enough."

---

[11] During Sly's interview, a second officer, Detective Kristian Fricke, questioned Sly, particularly as to how close to Webber Sly was when Webber was on the ground having already been shot several times. Sly actually demonstrated for Det. Fricke how he walked over to Webber when Webber was on the ground, closing the distance between them, and shot him twice in the head. Sly's description given to Det. Fricke was substantially similar to what he told Det. Buttone.

Sly conceded that he did not know what weapon, if any, Webber had on him, but he knew Webber to be "a mental patient," and he did not intend to give Webber the opportunity to "do what he said. [Webber] pointed to the ground and sa[id]: I promise you: That's where you're gonna be at." Sly admitted he did not consider retreating to call 9-1-1 as he had in the past, because he believed Webber had a weapon; someone else called 9-1-1 as he waited for the police to arrive.

Sly advised Det. Buttone that Webber had cameras situated all over his home—one that looks directly at Sly's house, one in front of Webber's house, and one in the alleyway towards Sly's bedroom—and he believed they would have captured the entire incident.

Det. Buttone testified that during the interview Sly recounted the tumultuous relationship between himself and Webber. Sly said the discord started when Webber tried to have Sly implicate a young neighbor in stealing Webber's rental car, and Sly refused because he did not see the boy steal anything. After that incident, Webber allegedly copped an "attitude" towards him. Sly described instances where Webber allegedly "pulled weapons" on him and his family, one of which resulted in charges (that Sly sought to have dropped) and a conviction against Webber. Sly claimed that Webber was on medication and explained that, when he failed to take it, "he gets like that." According to Sly, things appeared to have settled down, and while he thought everything was fine, trouble resurfaced when Webber's probation ended in October of 2019. Sly told Detective Buttone that a week prior to the shooting, while Webber was outside watering his lawn, Webber saw Sly and began cussing him out. In response, Sly told Webber to go take his medicine. Sly recalled that Webber pointed to the ground and said, "You see this? See right there? I promise you: That's where you're gonna [sic] be." Sly claimed that Webber later told him that "it was not over." Sly also told Det. Buttone that only days before the shooting, he had contacted a realtor, Tashia

Kennison, to help him get his house ready for sale because he and his wife had made the decision to move away from Webber. Sly told Det. Buttone that he did not normally carry a gun, but armed himself on the night of the shooting because Webber had threatened to kill him. At the close of the interview, Sly was placed under arrest for manslaughter.

Det. Buttone testified that while Sly told him that Webber's parole ended in October, 2019, after which problems between Webber and himself resurfaced and were escalating, criminal court records showed that Webber's parole actually ended on April 25, 2019. Additionally, Det. Buttone determined that, from the time Webber's probation terminated in April 2019, up to the November 11, 2019 shooting, there were no records indicating the JPSO had been contacted for a disturbance or altercation between Sly and Webber. Det. Buttone also noted that while Sly initially told him that, prior to the shooting, he saw Webber come out of his garage or the front door, Sly contradicted himself later in the interview on this point. Further, Det. Buttone testified that the gunshot wounds to Webber's body were inconsistent with Sly's description of how the incident took place.

Det. Buttone explained that he later went to the scene, knocked on nearby residents' doors, but that no one was willing to talk to him about the incident. He also took measurements at the scene of the shooting, and determined that there was a distance of forty feet from the end of the sidewalk where the first set of bullet casings were recovered to where Webber died. Det. Buttone testified that five bullet casings recovered at the scene indicated the firearm was fired five times at the initial location—the side of the street where Sly and Webber's residences were located—only four of those rounds struck Webber. While Webber lay on the ground across the street, the second location, Sly shot him twice more in the head.

Det. Buttone testified that he attended Webber's autopsy performed by Dr. Ellen Connor on the day after the shooting, and was aware of her assessment of the

gunshot wounds Webber received and the "entry and angles." As to the first four shots, the first went to Webber's right leg through the knee, impacting the tibia. When Webber bent down, the second shot went into Webber's shoulder and exited his armpit. Det. Buttone explained that the third shot was to Webber's left shin, and likely occurred as Webber was turning away. As he continued to move away, the fourth shot struck his upper back. Det. Buttone stated that Webber, now shot in the back, fell down on the sidewalk forty feet away. Det. Buttone said that this is when Sly dropped the first magazine and inserted the second magazine. As Webber was retreating, Sly continued to advance towards Webber, now on the ground across the street, and shot him for the fifth time in his left ear. The bullet exited forward, impacted the sidewalk, and re-entered Webber's face. According to Det. Buttone, the final shot was to the top of Webber's head.

### Dr. Ellen Connor

Dr. Ellen Connor with the Jefferson Parish Coroner's Office, stipulated by the parties as an expert in forensic pathology, testified that she performed the autopsy of Webber on November 12, 2019, and determined the cause of death to be multiple gunshot wounds, and the manner of death to be homicide. A toxicology screen detected caffeine in Webber's blood and urine, and fluoxetine (a generic of Prozac), an antidepressant, in his urine.[12] Dr. Connor confirmed that Webber sustained six gunshot wounds. She identified an entrance wound to Webber's right knee, which exited out of the back of his leg, having chipped Webber's tibia. She also identified entrance and corresponding exit wounds to Webber's left knee, as well as right upper back and right shoulder wounds that exited under his armpit. Dr. Connor described wounds to both sides of Webber's face, an entrance and exit wound to his left ear, and a graze wound associated with

---

[12]    Dr. Connor explained that a drug present in the blood produces a pharmaceutical effect, but that when a drug is found in the urine and not in the blood, the level is low enough that it may not be producing an effect in the body.

that entrance and exit wound. Dr. Connor opined that the bullet that went through Webber's ear, hit an object, and a fragment re-entered his cheek. Dr. Connor explained that this was consistent with Webber being on or close to the ground when this shot was fired. She further found an entrance wound towards the top of Webber's head and an exit wound to the right side of his head. Dr. Connor testified that she did not observe any soot or stippling on any of the gunshot wounds, indicating to her that the gun that fired the shots was at least one and a half feet away from Webber. She explained that one would see stippling, from material used to project the bullets from the gun, within one and a half feet, possibly between one and a half to three feet, but not past three feet.

### *Emily Terrebonne*

Emily Terrebonne of the JPSO Crime Laboratory, the State's expert in firearm and toolmark examination, testified that she created a crime scene sketch and analyzed seven fired bullet casings and two fragments taken from Webber's body. She concluded that the gun recovered from the scene fired each of the seven recovered casings, indicating there was only one firearm on the scene. She agreed that, given the location of the casings, the shooter fired from two locations, the first location being approximately forty feet from the second. Terrebonne testified that the gun at issue was not malfunctioning and operated optimally. She also explained that the trigger had to have been pulled for each shot fired.

### *Darlene Webber*

Darlene, who was married to Webber for thirty-three years, testified that she and her family moved to Chinkapin Street in May 2005. From 2015 to 2019, she lived there with Webber, their daughter, and their daughter's children. She testified that Sly and his wife lived next door, and at some point, the Slys' granddaughter moved in with them. Darlene described the Webber's relationship with the Slys as initially friendly and social, but the relationship changed when Sly

took some AC equipment that was located next to the Webbers' house without Webber's knowledge or consent and brought it to a scrapyard. Darlene stated that Sly and another neighbor were bringing drug dealers through their shared alleyway despite Webber having asked Sly not to "bring the people through the yard." Darlene denied that the incident involving the stolen vehicle had any bearing on the deterioration of Webber and Sly's relationship.

Darlene was questioned regarding several incidents that occurred between Webber and Sly. She testified that on October 3, 2015, while at work, she received a call from police advising her that Webber was outside their home holding a shotgun. Darlene confirmed Webber owned a shotgun, but no shotgun shells, and that Webber had the paperwork for its purchase. She testified that she explained to police that Webber felt increasingly threatened due to the foot traffic occurring in the alleyway, and he wanted it to appear to others that he could defend himself. No arrest was made.

Regarding a second incident that occurred only weeks later on October 30, 2015, Darlene testified that police were called to her home because Webber was holding the shotgun on his lap while cutting the grass. Webber had the right to possess the gun, neither threatened nor pointed the gun at anyone, and because there was no other evidence that a crime was committed, no arrest was made regarding the incident. Darlene denied ever telling Sly after the second incident that she would take the gun away from Webber. Similarly, Darlene denied that Webber was ever treated for mental health issues, that Webber ever took mental health medication, or that Webber would or could get aggressive if he failed to take the alleged medication.

Darlene was questioned about a third incident that occurred on October 6, 2017, resulting in Webber's arrest. She explained that the police called, because Webber was holding his shotgun and had allegedly pointed it at Sly. Darlene

claimed that Webber tried to tell the police that he had a gun in the garage, along with the paperwork to show that he owned it. Darlene said the police came into her home and pointed a gun at her and her grandbaby. She admitted that she "fussed" at the police because they were "violating [her] rights." The police obtained a search warrant to search her home and recover the firearm. Webber was ultimately arrested and pled guilty to a misdemeanor aggravated assault on September 27, 2018. Webber's sentence was deferred and he was placed on active probation for one year. Darlene claimed the two families discussed and set aside the issues between Webber and Sly, and there were no incidents between the two while Webber was on probation. When asked about a physical altercation that occurred between Webber and Sly in May of 2018, Darlene testified that although she was not home when the incident occurred, she did not see that Sly suffered an injured eye. Neither of the men were arrested.

Darlene testified that on the evening of the November 11, 2019 homicide, at approximately 5:02 p.m., she walked outside and left her home to go to the mall. As she was leaving, she saw the Slys and briefly spoke with Gwendolyn Sly, and noticed Sly moving trash from the backyard to the front. She greeted him, but he did not speak to her, which she claimed was unusual. While at the mall, Darlene testified that she received a phone call from her daughter telling her to hurry home because a neighbor from across the street called to say that Sly had shot Webber. When she got home, Darlene said she immediately went inside looking for Webber, to no avail. When she returned outside, the police on the scene realized that she was Webber's wife and would not allow her re-enter her home until after the investigation was completed.

Darlene testified that her home was equipped with surveillance cameras, including in the shared alleyway. She stated she was able to retrieve some of the video from the surveillance camera showing Webber moving towards the

trashcans, looking at his cellphone, and then putting the phone down and grabbing a can.  Darlene denied that she knew how to operate the surveillance camera system, and that she had not deleted any of the surveillance footage.

### Detective Robert Stoltz

Detective Robert Stoltz, then assigned to the JPSO 2nd District patrol division, testified that at noon on October 3, 2015, he responded to the 3800 block of Chinkapin Street regarding a complaint about a neighbor, Webber, standing outside with a shotgun.  Det. Stoltz stated that he examined the unloaded weapon and confirmed that Webber owned it, did not attempt to conceal it, and that no crime had been committed.  Consequently, no arrest was made.

Det. Stoltz testified that on October 30, 2015, he responded to a call from Gwendolyn Sly who reported that Webber was outside holding a shotgun while cutting his grass.  Det. Stoltz stated that he confirmed the firearm was not pointed at anyone and that no crime was committed.  No arrest was made.  He stated that he did not recall inquiring about Webber's mental health issues, but suggested that the Slys consider procuring a restraining order.

### Deputy Zellie Rouse

Deputy Zellie Rouse, previously employed by the JPSO, testified that in October 2017, she responded to the 3800 block of Chinkapin Street regarding a complaint that the caller's (Sly) next-door neighbor (Webber) was pointing a gun at him while he was outside of his residence.  Dep. Rouse stated that she spoke with Webber and confirmed that he did not have the firearm on his person.  She placed him in handcuffs and advised him of his rights.  Webber was belligerent and uncooperative.  Pursuant to a search warrant, the firearm—a TriStar TEC-12—was recovered from inside Webber's garage.  She could not recall whether any ammunition was recovered.  Webber was arrested for aggravated assault with a firearm; he was not charged with resisting arrest.

23-KA-60                                                17

### Lieutenant Solomon Burke

Lieutenant Burke, a commander of the JPSO's Digital Forensics Unit (DFU), and an expert in the field of mobile device forensics, testified that he attempted to analyze a DVR in this case, but was unable to recover any video from the surveillance system as it appeared to have been corrupted. When he attempted to retrieve video of the time period specified to him by the detective, that footage was not viewable, however footage from other time periods was viewable. Lt. Burke claimed he did not see any evidence suggesting that the drive had been tampered with, but rather, it appeared to have been corrupted by an "isolated shocking event," such as unplugging or plugging in the drive.

### Skylar Norel Sly

Skylar, Sly's eleven-year-old granddaughter, testified she was present at the time of the shooting. She stated that "like evening, midday" on November 11, 2019, she was preparing to go to the AT&T store with her grandparents. She followed Sly outside while her grandmother set the alarm. When they walked outside, Sly went to the throw something in the trash can, which was "put out on the grass" near his truck. Skylar stated that she was standing right behind Sly next to the truck when she saw Webber come from between his two trucks and approach Sly. She claimed she saw Webber confront Sly and then watched Webber reach directly down by his lower stomach. She saw Sly reach diagonally. Skylar stated that she saw fire and heard "pow, pow, pow…It all happened so quickly." Her grandmother then came out of the house and told Skylar to call the police. Skylar went inside and pushed both the "police" and "ambulance" buttons located on the alarm pad. She said she witnessed "most" of what happened to Webber, but did not actually see her grandfather go over and shoot Webber while he was on the ground.

### Lawrence Sly

Sly's trial testimony was largely consistent with the recorded statement he gave to the JPSO on the night of the shooting. Sly acknowledged that he had several prior felony convictions.[13] Sly acknowledged that the Webbers had a surveillance system, but denied there were drug dealers conducting business in the shared alleyway or that he had any stolen property in his backyard.

Sly reiterated that the problems with the Webbers commenced in 2015, when Sly refused to corroborate to the police Webber's story about the boy from across the street stealing the rental car that Webber left running and unattended in his driveway. According to Sly, after this incident, Webber developed a negative attitude towards him and made a statement that caused a rift between the families.

Sly recalled the October 3, 2015 incident, when he contacted the police because Webber was cutting the grass while holding an automatic weapon. Sly stated this incident frightened him because he had never before seen Webber carry a weapon. He testified that several weeks later, on October 30, 2015, he saw Webber come out of the alleyway between their two residences holding a weapon in his hand and looking across the street at the neighbors.[14] Sly stated that when he saw Webber, he asked him if he was all right. Sly claimed he eventually contacted the police to come investigate the situation, but no arrest was made. Sly testified that this was when he learned that Webber was taking medication and experiencing "mental problems." Sly explained that the relationship between the families continued to deteriorate, and that all of this was affecting him.

---

[13]    Sly was convicted of possession of stolen property in 1973, of attempting to obtain a prescription fraudulently in 1977, and of two counts of burglary and possession of stolen property in 1982.

[14]    A review of the JPSO incident reports contained in the record, as well as the trial testimony of JPSO officers, suggests that Sly confused the dates of these two incidents. On October 3, 2015, the police were called because Webber was walking outside of his home holding his firearm. At that time, Webber told police that he purchased the gun for protection because he believed his neighbor from across the street had stolen a car Webber had recently rented. The JPSO was summoned again on October 30, 2019, when Webber was cutting his grass while holding a firearm. Because it was determined that no crime had actually been committed by Webber, neither incident resulted in his arrest.

Sly testified that on October 6, 2017, he contacted police because, after returning home from the grocery store, Webber was standing outside of his residence with a weapon pointed at Sly and told Sly that there was something he wanted to talk to him about. Sly claimed he was afraid Webber was going to do something to him, but denied he had done anything to provoke Webber. The police were summoned and Sly gave them a statement. Webber was arrested for aggravated assault with a firearm, but ultimately pled guilty to a misdemeanor in September 2018. Webber's sentenced was deferred and he was placed on probation for one year. Sly acknowledged that he went to the district attorney's office on September 12, 2018, and requested that the case be dismissed and the charges dropped. Sly claimed that during Webber's one-year probation, Webber did nothing aggressive towards the Sly family.

Regarding the May 27, 2018 incident (after Webber had been arrested, but prior to his being placed on probation), Sly testified that he came outside of his house with his wife and sister-in-law to find Webber in the alleyway sitting on top of the gas meter wearing short pants, but no shirt or shoes. Sly stated that when Webber "grinned" and "made a laughing sound," he responded, "I can do that, too," and then Webber jumped up and began beating on his chest saying, "You want a piece of me, you want a piece of me? I been waiting on that." Sly explained that he returned to his residence, but came back out when he heard Webber cursing at his wife in Sly's driveway.[15] A physical altercation ensued where Webber wrestled Sly down and punched him in the eye, causing Sly to suffer a detached retina and permanent blindness in his right eye. The police were called to the scene, and arrived to find that both men had suffered injuries. Sly claimed he told police that he did not want to press charges.

---

[15] In Sly's video-recorded statement he stated that he went inside and retrieved his gun, and that his wife, who was upset, pleaded, "Please, don't do that. Don't do that." In his statement, Sly also claimed that Webber started cursing his wife and that when Sly cursed Webber back, Webber charged him.

Sly testified that a week before the shooting, he and his wife contacted a real estate agent, Natashia Kennison, about selling their home.[16] Sly explained that prior to making that call, Webber had made a threatening comment that instilled fear in Sly and a belief that Webber was going to kill him.

Sly testified that on November 11, 2019, several days after Webber had threatened his life, he was planning to go to the AT&T store with his wife and granddaughter. Before leaving the house, he armed himself and then walked outside to put something in the trash can.[17] He claimed that as he moved towards the trash can, Webber appeared from between his two trucks and was standing approximately eight to nine feet away from him, when Webber said something threatening (called Sly a "p***y mother f***er" and said that "whenever you're ready") and made a reaching motion. Sly claimed that he was still standing on his own property when Webber charged at him and, in response, Sly began to shoot. Sly stated that he had never before fired a weapon. Sly testified that he knew he hit Webber because Webber went down at one point, but even when he was down, Sly claimed that Webber "[was] constantly coming" at him. Sly claimed that Webber then began to cross the street—he walked, not crawled—onto the neighbor's property and Sly followed him. Once Webber made it across the street, Sly claimed Webber "was trying to raise up" and was still coming at him, so Sly shot him in the head. Sly said that as long as Webber was moving towards him, he felt threatened because he could not see Webber's hands.

---

[16]     Kennison, a licensed real estate agent and mortgage broker, testified at trial on behalf of the defense. She stated she had known the Slys her entire life, and was contacted by Gwendolyn Sly in November 2019 regarding the possibility of selling their home. They made arrangements for Kennison to come view the home on November 6, 2019, at which time she made some suggestions about making the house more pleasing to potential buyers.

[17]     Later in his testimony, Sly clarified that prior to going to the AT&T store, when he first walked went outside to throw something in the trash can, he saw that Webber was outside and home alone. This is when he went back inside his house, armed himself with the firearm and extra magazine, and then went back outside and proceeded to the trash can. While he was outside, his wife was inside setting the alarm.

Sly testified that as Webber walked away from him, he did not fire, and he denied intentionally shooting Webber in the back. Sly stated that, based on what Webber had told him several days prior, he believed Webber was going to kill him. Sly stated that he was concerned about Webber's mental state. When asked if he intended to kill Webber that night, Sly answered, "No, no. God in heaven knows I didn't. No. That was my -- that was not my intention." Sly denied that he had a plan to shoot Webber; his plan was to relocate.

Sly testified that after the shooting, he placed his gun on the hood of his truck and waited for the police to arrive. Sly explained that he was taken to the detective bureau, where he freely gave a statement. He was told him that he could have a lawyer present, but stated he did not want one. He denied Det. Buttone threatened him.

On cross-examination, Sly conceded that during the prior incidents with Webber, he never saw Webber with a handgun, only a rifle. Sly acknowledged that when he first fired his weapon, he intended to strike Webber, and that he shot his firearm seven times. He acknowledged that there were two scenes—the first one by the trash can where he initially fired upon Webber, and the second one across the street where he shot Webber twice in the head. In response to the State's question about whether he intended to inflict great bodily harm or to kill Webber, Sly replied, "When he made the move, yes." Sly conceded that he did not see Webber with a firearm the night of the shooting, but claimed that he did see Webber "reach" and he believed Webber "had something." While Sly admitted that he did not see Webber reach for anything immediately before he shot him in the head, Sly claimed that he saw Webber on the ground with his right hand and that he was "trying to raise up."

Sly conceded that he never tried to call 9-1-1 as he had done in the past, because someone else had already called. He said his focus was on Webber

because he believed Webber intended to kill him. Sly admitted that he did not just want to "wound" Webber, which he knew he had done "from the initial volley," and merely send Webber to the hospital, he wanted to finish it all that night. Sly testified that he knew if he only wounded Webber that Webber would "come back on [him]" when Webber recovered.

## DISCUSSION

### I.   *Sufficiency of the Evidence*

In his first assignment of error, Sly argues that the evidence at trial was insufficient to prove a conviction. He contends the evidence established that Webber was the aggressor, that he came onto Sly's property, and that Sly reasonably feared for his life and believed he was in imminent danger when he shot and killed Webber. Sly contends the evidence showed that Webber took Fluoxetine, but had stopped taking it at the time of the shooting, which affected Webber's mental state. Sly argues the evidence established that both he, who is visually impaired, and his granddaughter, Skylar, saw Webber reach for something, and that given Webber's history, it was reasonable for Sly to believe that Webber was reaching for a gun. Sly asserts that the location of Webber's cell phone, found next to Webber's body after the shooting, supports his contention that Webber was reaching for something. Further, Sly argues the evidence shows that Webber was continuously moving towards him when Sly fired the two final shots. Sly argues he presented evidence that the force he used was reasonable and in proportion to Webber's actions towards him, that the shooting was justified, and that the State failed to prove beyond a reasonable doubt that he was not acting in self-defense when he shot Webber.

In response, the State argues that the evidence was sufficient to sustain Sly's conviction because the jury could have reasonably found that Sly—not Webber— was the aggressor and/or that Sly did not have a reasonable belief that he was in

imminent danger of losing his life or receiving bodily harm when he shot Webber. In this regard, the State asserts that the prior incidents that occurred between Webber and Sly were remote in time to the instant shooting. The State contends that Webber's statement on the night in question—that he "was ready"—did not suggest that Sly was in imminent danger, as Sly had already armed himself and escalated the encounter by replying to Webber that he, too, "was ready." The State avers the testimony and evidence supported that Webber was unarmed at the time of the shooting, and that Sly's weapon was the only one discovered at the scene. The State argues that based on the testimony of the witnesses—including Sly's own testimony—Sly's contention that his actions were justifiable has no merit. The State concludes that the jury's verdict should be affirmed because the evidence was sufficient to establish that Sly killed Webber and had specific intent to do so.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, was sufficient to convince a trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So.2d 921, 928, *cert. denied*, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C.Cr.P. art 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So.2d 517, 521 (*per curiam*).

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Cuza*, 18-187 (La. App. 5 Cir. 11/28/18), 260 So.3d

754,758, *writ denied*, 19-17 (La. 11/12/19), 282 So.3d 232. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Baker*, 01-1397 (La. App. 5 Cir. 4/30/02), 816 So.2d 363, 365. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of any witness, in whole or in part. *State v. Burnham*, 16-468 (La App. 5 Cir. 2/8/17), 213 So.3d 470, 474, *writ denied*, 17-664 (La. 4/6/18), 240 So.3d 184. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1102.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 2034. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that in order to convict, assuming every fact to be proved that the evidence tends to prove, it must exclude every reasonable hypothesis of innocence. *State v. Becnel*, 17-591 (La. App. 5 Cir. 6/27/18), 250 So.3d 1207, 1225. This is not a separate test from the *Jackson* standard, but rather, provides a helpful basis for determining the existence of reasonable doubt. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id*.

Accordingly, in the instant case, this Court is charged with examining the evidence in the light most favorable to the prosecution and determining whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Hughes*, 14-487 (La. App. 5 Cir.

11/25/14), 165 So.3d 978, 990, *writ denied*, 14-2683 (La. 10/9/15), 178 So.3d 1001. Sly was convicted of second-degree murder. La. R.S. 14:30.1 defines second-degree murder as the killing of a human being when the offender: (1) has a specific intent to kill or inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or inflict great bodily harm. *See State v. Lewis*, 05-170 (La App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277. Here, the jury was informed that it could convict Sly under the specific intent theory of second-degree murder.

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Such a state of mind can be formed in an instant. *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So.2d 89, 94. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant, as well as the extent and severity of the victim's injuries. *State v. Bradstreet*, 16-80 (La. App. 5 Cir. 6/30/16), 196 So.3d 876, 885, *writ denied*, 16-1567 (La. 6/5/17), 220 So.3d 752. Louisiana courts have found that aiming a lethal weapon and discharging it at close range in the direction of a victim is indicative of a specific intent to kill. *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, 585, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277; *State v. Baptiste*, 06-869 (La. App. 5 Cir. 4/11/07). 958 So.2d 24, 27. The determination of whether the requisite intent is present is a question of fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *State v. Patterson*, 10-415 (La. App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037.

Applying these legal principles to the evidence established in this case, we find that a rational trier of fact could have found under the *Jackson* standard that

the State carried its burden of proving beyond a reasonable doubt that Sly acted with specific intent to kill or inflict great bodily harm upon Webber. Sly does not deny that he killed Webber; rather he claims that his actions were justified because he acted in self-defense based on his reasonable belief that Webber was reaching for a gun. On appeal, Sly essentially asserts that the State failed to prove beyond a reasonable doubt that the homicide was not committed in self-defense. He argues the circumstantial evidence presented by the State; *i.e.*, the lack of a weapon found on Webber at the scene, the fact that Sly armed himself before leaving his residence when he saw that Webber was home alone, and Sly's admission that he shot Webber, was not enough to refute Sly's self-defense assertion. In short, Sly contends that no rational jury could have rejected his claim that he justifiably killed Webber in self-defense.

The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18; *State v. Martin*, 20-141 (La. App. 5 Cir. 4/28/21), 347 So.3d 1061, 1067, *writ denied*, 21-803 (La. 10/1/21), 324 So.3d 1054. When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Batiste*, 16-321 (La. App. 5 Cir. 12/14/16), 208 So.3d 1028, 1033, *writ denied*, 17-300 (La. 11/17/17), 229 So.3d 929. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force and may stand his or her ground and meet force with force. La. R.S. 14:20(C).

A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict. La. R.S. 14:21; *State v. Howard*, 15-473 (La. App. 5 Cir. 12/9/15), 182 So.3d 360, 363. While there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. *Martin*, 347 So.3d at 1068; *State v. King*, 11-767 (La. App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, *writ denied*, 12-660 (La. 9/14/12), 99 So.3d 35.

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Leach*, 22-194 (La. App. 5 Cir. 12/28/22), 356 So.3d 531, 544. The determination of a defendant's culpability rests on a two-fold test: (1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and (2) whether deadly force was necessary to prevent the danger. The jury is the ultimate fact finder in determining whether the State negated self-defense beyond a reasonable doubt. *State v. Sinceno*, 12-118 (La. App. 5 Cir. 7/31/12), 99 So.3d 712, 720, *writ denied*, 12-2024 (La. 1/25/13), 105 So.3d 713.

Here, Sly attempted to establish that he shot Webber in self-defense because Webber had previously threatened him with a shotgun and intimated that he intended to put him "in the ground." However, we find that the State presented evidence, which proved beyond a reasonable doubt, that Sly did not act in self-defense. The testimony of the investigating officers confirmed that Webber did not have a firearm or other weapon on his person, and Sly admitted that he did not

actually see Webber in possession of a gun at the time of the shooting, and that he had never before seen Webber with a handgun and/or pistol.

The evidence also established that Sly fired seven shots, ultimately hitting Webber six times. Sly initially shot Webber four times. Two of those shots struck Webber in the legs. Dr. Connor explained that the path to the right knee chipped Webber's tibia, and that the shot to the left knee caused a fracture. Dr. Connor also noted an entrance wound to Webber's right upper back exiting his right chest indicated that Sly was, or became, the aggressor. The evidence further established that after the first four shots fracturing both of Webber's legs and striking him from behind in the upper back, Webber crossed the street. By Sly's own admission, he followed Webber and shot him twice in the head. Dr. Connor opined that as to one of those shots, the bullet went through Webber's ear, hit an object, and re-entered Webber's cheek, indicating that Webber was either on or close to the ground at that time. Dr. Connor testified that the second gunshot wound entered the top of Webber's head, and that for this to have happened, the shooter's gun "would have to be shot from above," indicating to her that Webber's head was facing downwards when the shooter fired this shot, and that the shooter was at least one and a half feet away. This forensic evidence does not support Sly's claim of self-defense. *See Patterson*, *supra*.

In an attempt to portray Webber as the aggressor, evidence of the antagonistic relationship existing between Webber and Sly was presented. However, we find that these incidents were remote in time to the instant offense; there was no evidence of any altercation between the men in the immediate context of the shooting. Sly recalled to Detective Fricke that he had not seen Webber earlier in the day. Moreover, it was unclear from both his trial testimony and his recorded statement whether, on the night of the shooting, Sly left his house armed, or saw that Webber was home alone and then went into his residence to retrieve his

weapon and extra magazine. "The law does not permit an individual to track down his enemy, shoot him with a firearm, and then claim justification for the homicide because of prior threats." *State v. Pham*, 12-635 (La. App. 5 Cir. 5/16/13), 119 So.3d 202, 213, *writ denied*, 13-1398 (La. 12/6/13), 129 So.3d 351.

Although Sly contends the shooting was justified because he and his granddaughter both saw Webber "reaching," no weapon other than Sly's was recovered from the scene; only a cell phone was recovered near Webber's body. The jury apparently determined that the act of Webber reaching for his cell phone would not have placed a reasonable person in fear of death or great bodily harm. *See State v. Hidalgo*, 95-319 (La. App. 5 Cir. 1/17/96), 68 So.2d 1188, 1198. Moreover, the jury could have reasonably concluded that Webber's alleged comment—"when you're ready, I'm ready"—was insufficient to support a belief that Sly was in imminent danger of losing his life or receiving great bodily harm so as to justify the use of deadly force. Instead, the jury could have reasonably determined that Sly, who had armed himself in anticipation of an encounter with Webber, was the aggressor and escalated matters when he told Webber that, "I'm ready now." The evidence shows that it was after this comment that Sly then pulled out his weapon, fired multiple shots at Webber, changed magazines, followed Webber across the street, and then shot Webber twice in the head as Webber lay on the ground because, as Sly admitted, he did not want Webber to survive. Sly conceded that he did not see Webber with a weapon at the time he shot him, and he had never seen Webber with a handgun, only a rifle. The jury also heard Sly testify that, before shooting Webber in the head as he lay clearly wounded on the ground, "I should have stopped … but … I didn't want to wound him so he would go to the hospital then he would come back on me."

The jury heard this conflicting testimony and credited the version of events established by the State's expert witnesses. Also, the trial court instructed the jury

regarding self-defense. The jury is the ultimate fact finder in determining whether the State negated self-defense beyond a reasonable doubt. *Sinceno*, *supra*. On review, we find that a reasonable jury could have rationally concluded that Sly was the aggressor, and thus, was precluded from claiming self-defense, and further, that the State proved beyond a reasonable doubt that the killing of Webber was not justified as Sly did not have a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm. Accordingly, this assignment of error is without merit.

## II.    *Confrontation Clause and Napue Violations*

In his second assignment of error, Sly alleges that his right to confront and cross-examine the witnesses against him was violated when the State was allowed to introduce a 9-1-1 call containing testimonial statements and incorrectly attributed the call to Damon Payne. Sly argues the 9-1-1 call should not have been admitted because the eyewitness that made the call was never produced and that the call was instead attributed to Damon Payne. Consequently, Sly avers that he was denied the right to confront and cross-examine the *actual* 9-1-1 caller, and that this error was not harmless. Additionally, Sly argues the call was testimonial and constituted inadmissible hearsay evidence, and that there was no evidence linking Payne's phone number to the number from which the 9-1-1 call was made. Sly avers the State knew Payne was not the caller, and alludes that the State allowed false evidence to go uncorrected in violation of *Napue v. People of State of Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), entitling him to a new trial.

In response, the State contends that Sly's claim of a constitutional confrontation violation was not properly preserved for appellate review as no contemporaneous objection to the admission and publication of the 9-1-1 call, or the testimony of Payne, was made at trial. Nevertheless, the State posits that even if it was preserved, the 9-1-1 call was non-testimonial and any error in admitting

the call would have been harmless. As to the allegation that the State allowed false evidence to go uncorrected, the State asserts that Detective Zanotelli's report does not refute the contention that Payne was the male 9-1-1 caller, and that the 9-1-1 call would have been admissible even if the male caller did not testify. The State contends that this issue was also not preserved for appellate review.

We note that the record contains no motion(s) pertaining to the admissibility of the 9-1-1 calls. At trial, the parties stipulated that, if called to testify, Nancy Weber Clary, the custodian of records for the Jefferson Parish communications department, would testify regarding the recording and identification of 9-1-1 calls. A 9-1-1 recording and association call action detail were admitted into evidence by the State. Defense counsel specifically stated that he had no objection to the State's admitting the CD of the 9-1-1 calls into evidence. When the 9-1-1 call was first published to the jury, defense counsel made no objection. Additionally, the 9-1-1 call from the male was played several times during Payne's testimony with no contemporaneous objection by defense counsel.

The Sixth Amendment to the United States Constitution guarantees the right of the accused in a criminal prosecution to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution also expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. Art. I. § 16. Confrontation Clause violations do not fit within the limited category of constitutional errors that are deemed prejudicial in every case—the violation of a defendant's right to confrontation may constitute harmless error. *State v. Mullins*, 14-2260 (La. 1/27/16), 188 So.3d 164, 171.

In order to preserve the right to seek appellate review of an alleged trial court error, the party alleging the error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. La. C.Cr.P. art. 841; *State v. Williams*, 04-608 (La. App. 5 Cir. 11/30/04), 889

So.2d 1093, 1100, *writ denied*, 05-81 (La. 4/22/05), 899 So.2d 559. The purpose of the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. *Id.* This prevents the defendant from gambling for a favorable verdict at trial, and then later utilizing appellate review to correct errors that might easily have been corrected by the trial judge. *State v. Berkeley*, 00-1900 (La. App. 5 Cir. 5/30/01), 788 So.2d 647, 653, *writ denied*, 01-1659 (La. 4/26/02), 814 So.2d 549. In the present case, because Sly has raised his objection to the admission of the male caller's 9-1-1 call for the first time on appeal, there is no ruling for this Court to review. *See State v. Davis*, 06-402 (La. App. 5 Cir. 11/28/06), 947 So.2d 48, 58, *writ denied*, 07-03 (La. 9/14/07), 963 So.2d 996.

The contention that the State allowed false evidence to go uncorrected in violation of *Napue* was also not preserved. *See State v. Patton*, 22-112 (La. App. 5 Cir. 12/21/22), 355 So.3d 156, 172; *State v. Sparkman*, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 113, *writ denied*, 14-477 (La. 11/26/14), 152 So.3d 897. In *Patton*, this Court explained that even if the matter had been preserved, the defendant had not shown that the testimony was false and, therefore, failed to prove a *Napue* violation. Similarly, in the case *sub judice*, after reviewing the record, we find that Sly failed to establish that Payne did not make the 9-1-1 call.

Because Sly has raised the alleged confrontation clause and *Napue* violations for the first time on appeal, there is no ruling for this Court to review, and thus, no relief is warranted.

### III. *Sly was Denied his Right to Present a Defense*

Sly argues on appeal that he was precluded from introducing critical evidence to support his claim that he acted in self-defense.[18] In particular, Sly contends that, prior to trial, he was prohibited from obtaining pertinent medical and prescription information relating to Webber, which Sly claimed would show that, without taking his medication, allegedly prescribed for "self-control management" following a stroke, Webber was known to become aggressive and "act out." Sly avers the State knew that Webber was court ordered to undergo an evaluation by Jefferson Parish Human Services Authority ("JPHSA"), and that he was on disability. Sly argues that because he was precluded from presenting this evidence at trial, the jury was incorrectly led to believe that Webber had no mental health issues, thereby denying Sly the right to present a defense material to the issue of self-defense and to challenge the credibility of Darlene Webber.[19] Sly also argues that the defense subpoenaed JPSO Deputy Tynisha Griffin, who failed to appear at trial, and she would have provided testimony regarding the May 27, 2018 incident wherein Webber punched Sly in the eye injuring him. For these reasons, Sly concludes that his conviction and sentence should be reversed and the matter remanded to the trial court for a new trial.

The State responds that the trial court properly denied Sly's motions for discovery of Webber's medical and prescription records, which ruling this Court affirmed, and the Louisiana Supreme Court denied writs. *Sly v. State*, 21-648 (La. App. 5 Cir. 11//9/21), 2021 WL 5869521 (unpublished writ disposition); *writ denied*, 21-01849 (La. 2/15/22), 332 So.3d 1180. The State avers that Sly failed to

---

[18]   Sly made the same arguments in his motion for new trial, which was denied on July 11, 2022.

[19]   Sly posited that the evidence would have explained the periods of relative calm that occurred when Webber was taking his medication, followed by Webber's sudden aggressive behavior towards Sly when he was not taking his medication. According to Sly, the fact that Webber had been prescribed anti-aggression medication following a stroke, and there was a lack of such medication found in Webber's system on the date of the shooting, corroborated his claim that Webber was the aggressor and that he responded to Webber's aggression in self-defense.

establish the trial court abused its discretion in denying discovery of this evidence or that Sly was denied a fair trial on that basis. Further, the State contends that the jury was aware of the presence of Fluoextine in Webber's urine and beyond that, Sly's claims regarding Webber's mental health are speculative and unsupported by the record. As to the issue of subpoenaing Deputy Griffin, the State urges that was issue not preserved for appellate review.

### A.      Webber's Medical and Prescription Records

In his first and second pre-trial motions for supplemental discovery, Sly requested the name(s) of the hospital and pharmacy treating Webber in order that defense counsel could then issue *subpoenas duces tecum* to those facilities for Webber's medical records. In granting the motion to quash filed by the State in response to Sly's first motion, the trial court ruled that Sly's request failed to demonstrate all three of the requirements, *i.e.*, "relevancy, admissibility, specificity," necessary for it to approve the issuance of pre-trial subpoenas which fall outside the scope of La. C.Cr.P. art. 716, *et seq. See State v. Marcelin*, 10-1036 (La. 10/15/10), 46 So.3d 191, 193. Put simply, the trial court determined that Sly failed to produce the requisite evidence establishing the admissibility of the documents. Further, Webber's family asserted that the requested records were privileged and confidential under La. C.E. art. 510(C),[20] and the trial court found that Sly failed to articulate an applicable exception to La. C.E. art. 510(C), and that none of the general exceptions provided in La. C.E. art. 510(C)(2) applied.

After the trial court granted Sly's motion *in limine* to admit evidence of Webber's "dangerous character," finding that Sly had "produced evidence that [Webber] made an overt, hostile act at the time of the incident, sufficient to satisfy

---

[20]     La. C.E. art. 510(C)'s general rule of privilege states that "[i]n a criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself, his representative, and his physician or psychotherapist, and their representatives."

the requirements of La. C.E. art. 404(A)(2), which ruling this Court affirmed (*see Sly v. State*, 21-K-297 (La. App. 5 Cir. 6/17/21) (unpublished writ disposition), Sly filed a second motion for supplemental discovery seeking the same medical and prescription information relating to Webber in anticipation of filing a *subpoena duces tecum* for those records. In denying his second motion for supplemental discovery, the trial court stated that without evidence that Webber had previously engaged in aggressive behavior while "off" his prescribed medication, Sly's theory for the relevance of the supplemental discovery was too speculative to warrant a breach of Webber's right to medical privacy, and too speculative to be reliable. Consequently, the trial court determined that Sly failed to establish admissibility. On review, this Court denied Sly's writ application explaining that Sly's "request [was] overly broad" and that "granting same would not strike the proper balance between [Sly's] right to a vigorous defense and the privacy interests of [Webber] and his family." This Court further noted that Sly was "still able to introduce evidence of [Webber's] aggressive behavior at trial as part of his defense." *See Sly*, 21 WL 5869521, *supra*.

Although both the Sixth Amendment to the United States Constitution and Louisiana Constitution Art. I, § 16 provide that a criminal defendant has the right to present a defense, this constitutional right does not translate to a right to conduct unfettered discovery. In fact, defendants do not have a general constitutional right to unlimited discovery in a criminal case. *State v. Kelly*, 17-442 (La. App. 5 Cir. 2/21/18), 239 So.3d 432, 444. Moreover, it is well-established that trial courts have vast discretion in the regulation of pre-trial discovery. *Id*. A trial court's determination regarding matters of discovery will not be overturned absent a clear abuse of that discretion. *Id*. Additionally, under the discretionary principle of "law of the case," an appellate court will generally refuse to consider its own rulings of law on a subsequent appeal in the same case. *State v. Allen*, 17-685 (La.

App. 5 Cir. 5/16/18), 247 So.3d 179, 185, *writ denied*, 18-1042 (La. 11/15/18), 255 So.3d 998. The principle is applicable to all decisions of an appellate court, not solely those arising from full appeal. *State v. Johnson*, 06-859 (La. App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for the imposition of the doctrine is the avoidance of indefinite re-litigation of the same issue, but it will not be applied in cases of palpable former error. *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 25, *writ denied sub nom. State ex rel. Massey v. State*, 12-993 (La. 9/21/12), 98 So.3d 332. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. *Id*.

In the instant case, Sly does not cite any case law in support of his position that he was denied a right to present a defense. Further, Sly fails to even acknowledge that he previously sought this Court's supervisory review regarding the discovery of Webber's medical and prescription histories. In effect, Sly seeks this Court's reconsideration of its prior ruling finding that his discovery request for Webber's medical and prescription histories was overly broad, and that granting the request would not strike the proper balance between Sly's right to a vigorous defense and the privacy interests of Webber and his family, a ruling wherein the Louisiana Supreme Court likewise denied Sly's request for supervisory review.

The issue Sly now raises on appeal is the same issue this Court has previously reviewed and ruled upon. Sly's brief does not allege new facts or additional jurisprudence. On the record before us, Sly has failed to show that reconsideration of this same issue is warranted or that this Court's prior determination of the issue was patently erroneous or produced unjust results. Consequently, as there is nothing new that justifies this Court revisiting its prior decision, we decline to do so.

**B. Subpoena of Deputy Tynisha Griffin**

Sly argues that he was further denied his constitutional right to present a defense due to the failure of Deputy Griffin, who was subpoenaed by the defense, to appear at trial to testify regarding the May 27, 2018 incident, wherein Webber punched Sly in the eye. Sly contends that his counsel advised the trial court of the problem, requested an instanter subpoena, and requested assistance from the State, to no avail.

Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a defendant the right to compulsory process and to present a defense. A defendant's right to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served. *State v. Jackson*, 07-84 (La. App. 5 Cir. 6/26/07), 963 So.2d 432, 438, *writ denied*, 07-1666 (La. 1/25/08), 973 So.3d 754. La. C.Cr.P. art. 731(A) provides that the court shall issue subpoenas for the compulsory attendance of witnesses at hearings or trials when requested to do so by the State or the defendant, and that clerks of court may issue subpoenas except as provided in Article 739. However, a defendant's inability to obtain service of requested subpoenas will not be grounds for reversal of a conviction or for a new trial absent a showing of prejudicial error. *State v. Gatewood*, 12-281 (La. App. 5 Cir. 10/30/12), 103 So.3d 627, 638. To show prejudicial error, a defendant must show that the absent witness's testimony would have been favorable to his defense and the possibility of a different outcome if that witness were to testify. *Id.* Prejudicial error arises when the absent witness is vital to the defense. *State v. Cavalier*, 14-579 (La. App. 4 Cir. 6/19/25), 171 So.3d 1117, 1127, *writ denied*, 15-1374 (La. 9/6/16), 205 So.3d 914.

Here, while the record reflects that Deputy Griffin was intended to be called regarding the May 27, 2018 incident, defense counsel failed to object or request

particular relief from the trial judge when it was clear Deputy Griffin was not going to appear. Further, it is also unclear from the record whether Deputy Griffin was actually served with the subpoena. While defense counsel did ask the trial court to issue an instanter subpoena (which could only have been issued upon confirmation that she was served), and requested assistance from the State to locate Deputy Griffin, defense counsel did not object or move for a recess, but instead indicated that he would move forward without her. Consequently, any claim that Deputy Griffin's alleged failure to appear denied Sly his right to present a defense was not preserved for appellate review.[21] *See* La. C.Cr.P. art. 841; *see also State v. Gordon*, 00-1013 (La. App. 5 Cir. 11/27/01), 803 So.2d 131, 148, *writ denied sub nom. State ex rel. Gordon v. State*, 02-362 (La. 12/19/02), 833 So.2d 336, and *writ denied*, 02-209 (La. 2/14/03), 836 So.2d 134.

IV. ***State's Alleged Failure to Disclose Material, Relevant Impeachment Evidence and Allowed False Testimony to go Uncorrected***

In his fourth assignment of error, Sly reiterates that despite his requests, he was not provided Webber's medical and mental health records. Sly contends the State allowed Darlene Webber to falsely testify that Webber had no disabilities and no mental health issues even though the State possessed records indicating that Webber was, in fact, on disability and was previously court-ordered to undergo an evaluation by JPHSA following the October 6, 2019 incident wherein Webber pointed a rifle at Sly. According to Sly, the State had a duty to produce this impeachment evidence and to correct Darlene's testimony, and because the State failed to do so, his conviction and sentence should be reversed.

In response, the State avers that the *nunc pro tunc* commitment reflecting that Webber was ordered to undergo a JPHSA evaluation as a condition of

---

[21] While Sly asserts that Deputy Griffin would have testified about the May 27, 2018 incident, Sly does not demonstrate that the deputy's testimony would have been favorable to his defense, nor does he show the possibility of a different outcome if she had testified. *See State v. Jones*, 345 So.2d 1161, 1165 (La. 1977).

probation in another case did not establish that Webber had a mental health issue as a result of his stroke or otherwise. Additionally, the State contends that Sly failed to point to anything that would demonstrate that Darlene testified falsely. It argues that even if her testimony was false, the *nunc pro tunc* commitment is insufficient to establish the State knew such testimony was false and failed to correct it. The State also contends the *nunc pro tunc* commitment was not withheld from defense counsel as defense counsel filed it into the record.[22]

At trial, when asked if Webber ever had any disabilities, Darlene testified that he did not. When asked if Webber was ever injured in any way, Darlene answered affirmatively and explained that Webber "had a disability as far as his – on a job he worked for Associated Grain. And he hit the side of his neck and hurt his arm and tore like a ligament and had to get like a rotator cuff surgery for that." Darlene stated that this resulted in a disability to Webber's arm "where he couldn't really move the arm like he wanted." Darlene also testified that Webber had suffered a stroke at one point, but denied that he had mental health issues.

The record reflects that Sly knew that Webber was previously ordered to undergo a JPHSA evaluation as evidenced by the *nunc pro tunc* commitment minute entry filed by defense counsel over a year prior to trial. As to Sly's argument that the State had a duty to correct Darlene's testimony that her husband had a disability or mental health issues, the record reflects that the issue was not objected to below and, therefore, the issue was not preserved for appellate review. La. C.Cr.P. art. 841; s*ee also Patton*, *supra*; *Sparkman*, *supra*. Accordingly, we decline to consider this issue.

---

[22] On March 23, 2021, defense counsel filed a notice of overt acts pursuant to La. C.E. art. 404(A)(2), motion *in limine* and memorandum in support to admit evidence of victim's character, and supplemental request for medical information, attaching several exhibits thereto, including an October 2, 2018 *nunc pro tunc* commitment minute entry. The minute entry reflects that Webber pled guilty to aggravated assault and was placed on active probation for one year. One specified condition of probation was that Webber "shall undergo JPHSA evaluation within 30 days …"

**V.** *Jury Instruction Errors Mandate a New Trial*

Sly argues on appeal that during jury deliberations, on three occasions, the jury requested to be reinstructed on the four responsive verdicts. He asserts that on each occasion, the jury was not reinstructed on "justifiable homicide" or the State's burden to prove beyond reasonable doubt that Sly did not act in self-defense when he shot Webber. Sly argues the error was compounded because the court gave "an acquit first" instruction each time. Sly concludes that the court's error was not harmless and, thus, he is entitled to a new trial.

The State argues that Sly failed to preserve the issue for appellate review as he failed to lodge a contemporaneous objection to the manner in which the court re-instructed the jury.

Louisiana Code of Criminal Procedure article 802 mandates the trial court to instruct the jury on the law applicable to the case. Pursuant to La. C.Cr.P art. 801(C), "[a] party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the error." This Court has held that a defendant is required to make a timely objection under La. C.Cr.P. art. 801 in order preserve a jury charge issue for review. *State v. Lavigne*, 22-282 (La. App. 5 Cir. 5/24/23), 365 So.3d 919. Additionally, La. C.Cr.P. art. 808 authorizes the giving of additional instructions after deliberations have begun, upon request by the jury or any member thereof. It is not error where a trial court declines to give an additional instruction as to a matter outside the scope of the jury's request for additional instructions. *State v. Price*, 02-360 (La. App. 4 Cir. 4/2/03), 842 So.2d 491, 512, *writ denied sub nom. State v. Honore*, 03-1322 (La. 11/21/03), 860 So.2d 542, and *writ denied*, 03-1517 (La. 12/12/03), 860 So.2d 1151.

The record shows that as the jury was deliberating, it sent a question to the trial judge, asking "What is the legal definition of the four responsive verdicts?"

After informing the attorneys of the question, the judge advised that the jury would be brought back into court, where she would re-read the four responsive verdicts. Counsel for both sides indicated their approval. The judge explained that she would start on page six of the instructions and read until the conclusion of page seven—the instructions on self-defense and justifiable homicide were included on page eight. When counsel were asked if there were any objections, both sides stated they did not object. Once the jury returned to the courtroom, the trial judge only re-read the instructions regarding second degree murder, manslaughter, negligent homicide, and finding Sly not guilty. The instructions on self-defense and justifiable homicide were not re-read. No objections were made.

Later, the trial judge received essentially the same question from the jury. When speaking with counsel, she advised that she would "read from … the middle of page 6, that starts with, 'The defendant has been charged with the second degree murder of Garland Webber,' and ending at the bottom of page 7 with the not guilty instruction." The prosecutor and defense counsel each stated they had no objection. After the jury returned to the courtroom, the judge re-read the same portions previously re-read. Again, the judge did not re-read the instructions on self-defense and justifiable homicide. No objections from counsel were made.[23]

On a third occasion, the trial judge received another question from the jury again asking for the definition of the four responsive verdicts. The judge explained that she would again "read from the middle of page 6 starting with, 'The defendant has been charged with [the] second murder of Garland Webber,' and continue through the end of page 7, ending with the charge on not guilty." When the judge asked counsel if they were in agreement, they responded affirmatively. The trial judge expressly stated to counsel that "it will be the same exact thing I've read twice before." After returning to the courtroom, the trial judge re-read to the jury

---

[23] The trial judge was then asked a question about an unrelated trial exhibit to which she responded.

the same portion of the instructions she previously read. As before, the judge did not re-read the instructions on self-defense and justifiable homicide. No objections from counsel were made.

After careful review of the record, and each of three occasions the trial judge re-instructed the jury as to the four responsive verdicts as noted above—which, as defendant argues, did not include re-reading the instructions on self-defense or justifiable homicide—we found that no objections were lodged by counsel for either side. The record reflects that each time the trial judge received a question from the jury, she consulted with counsel, advised exactly what she was going to read to the jury, and counsel for both the defense and prosecution expressly stated they had no objection. Accordingly, because Sly did not raise his objection to the re-instructions in the court below, this issue was not properly preserved for appellate review. *See State v. Lowery*, 33,905 (La. App. 2 Cir. 2/28/01), 781 So.2d 713, 724, *writ denied*, 01-1041 (La. 2/22/02), 809 So.2d 978.

Nevertheless, even had the issue been properly preserved for review and error found, it was harmless. In determining harmless error, it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error." *State v. Frickey*, 22-261 (La. App. 5 Cir. 3/1/23), 360 So.3d 18, 50. In the instant case, we find the guilty verdict actually rendered was surely unattributable to any error in re-instructing the jury. The record shows the trial judge re-read the requested instructions and properly did not go beyond the scope of the jury questions. Additionally, the portion of the jury charges of which Sly now complains were read to the jury when it was originally charged.

**VI.  *Alleged Prejudicial Voir Dire***

Sly argues that he is entitled to a new trial because the trial court improperly allowed the State to pose hypothetical questions to prospective jurors during *voir*

*dire* that required jurors to reject self-defense and convict him of second-degree murder. Sly further argues that during *voir dire*, the State falsely accused defense counsel of admitting "his client murdered someone."

In response, the State argues the hypothetical was relevant in order to examine the jurors' understanding of concepts such as the "aggressor doctrine" and "imminent danger." The State contends the prosecutor did not require a commitment or pre-judgment from the jurors or pry into the jurors' opinions about issues to be resolved in the case. Regarding the prosecutor's statement that defense counsel said his client murdered someone, the State avers the prosecutor rephrased the remark, and that defense counsel did not request either an admonition or a mistrial, and thus, did not preserve the issue for appellate review.

Pursuant to La. C.Cr.P. art. 786, the court, the State, and defense counsel, shall have the right to examine prospective jurors. The purpose of *voir dire* is to determine qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause and to secure information or an intelligent exercise of peremptory challenges. *State v. Housely*, 05-502 (La. App. 5 Cir. 1/31/06), 922 So.2d 659, 662, *writ denied*, 06-1183 (La. 11/17/06), 942 So.2d 531.

Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. *Voir dire* examination may not encompass unlimited inquiry into all possible prejudices of prospective jurors, their opinions on the evidence to be offered at trial, nor hypothetical questions and questions of law which call for any pre-judgment of supposed facts. *State v. Harris*, 17-303 (La. App. 5 Cir. 12/20/17), 235 So.3d 1354, 1364, *writ denied*, 18-0160 (La. 6/15/18), 257 So.3d 675; s*ee also State v. Rogers*, 94-997 (La. App. 5

Cir. 5/30/95), 656 So.2d 768, 772. However, it is permissible for *voir dire* questions to reasonably explore a juror's potential prejudices, predispositions or misunderstandings relevant to the central issues of the particular case. *Id.* The trial court is given broad discretion in regulating the conduct of *voir dire*, and its ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. La. C.Cr.P. art. 786; *State v. Bravo*, 16-562 (La. App. 5 Cir. 4/12/17), 219 So.3d 1213, 1219. In evaluating the fairness of the trial judge's ruling, the entire *voir dire* examination should be considered. *Id.*

Here, during the first panel of *voir dire*, the prosecutor presented a hypothetical involving co-workers whose offices were located next to one another, where one co-worker walked around the office with a steak knife for years. Defense counsel objected arguing the hypothetical was "getting kind of close to the facts of this case" because Sly and Webber were next-door neighbors and there were prior incidents involving Webber walking around with a rifle. In response, the State argued that the instant case was completely different to the hypothetical he was posing, and that the State was not asking the potential jurors to commit, but rather, his intent was to talk about the concepts and legal issues presented by the case—*i.e.*, Sly's claim of self-defense. The trial judge overruled defense counsel's objection, and the prosecutor was allowed to complete the hypothetical.

Also during the first panel of *voir dire*, defense counsel stated to prospective jurors that Sly killed Webber, but stated the killing "was justified, and it was in self-defense." During the second panel of *voir dire*, after asking prospective jurors who had the burden of proof, the prosecutor stated, "Good; so let's talk about what I know: [Defense counsel] got up here and said, 'My client committed murder and he brought up self-defense.' First we have to prove murder, okay?" The record does not reflect that defense counsel made an objection at that time.

Later during the second panel of *voir dire*, the prosecution posed a similar hypothetical about rival coworkers, where one walked around for years with a steak knife and threatened the other. The prosecution posed that on the date of the murder, the first coworker was "flying out of" her office screaming, at which point the second coworker stated he had enough, and put a machete in the back of the first coworker's Achilles heel. The prosecutor went on to question potential jurors about whether the second coworker's actions were necessary, and if it would matter if the first coworker had a knife in her hand. The prosecutor expanded the hypothetical by stating that the first coworker's Achilles heel was sliced and that, while she was crawling on the ground to get under her desk, the second coworker was wiping the blood off of his machete. The second coworker then walked over to the first, now underneath the desk, and sliced her throat. The prosecutor explained that the hypothetical was just an example, and asked the potential jurors whether the first coworker was still a threat and whether force was still necessary. She stated the situation could change and that it could appear to be self-defense at first.

At this point, defense counsel objected on grounds that the State's hypothetical was improperly going into the facts of the instant case. In response, the State argued the hypothetical involved a knife and a machete. Defense counsel urged that the facts of the instant case involved a gun and that the allegation was that Sly "shot Webber right there on his property and then again when he was across the street." The State argued the hypothetical did not involve the same facts but described a legal principle. The court overruled defense counsel's objection.

While speaking to the third panel of *voir dire*, after asking potential jurors if they could return a verdict if the State proved its case beyond a reasonable doubt, the prosecution stated, "Ultimately, second degree murder, [defense counsel] got up there and admitted that his client murdered someone." Defense counsel

interjected, "No, no, no, no. Nobody ever said anybody murdered anybody. Objection to that question." At a bench conference, the trial judge stated she did not believe she heard the term "murdered" from defense counsel, but only remembered hearing him admit "that his client shot and killed." One prosecutor responded his belief that he heard defense counsel twice say "murdered," and the second prosecutor stated she only heard defense counsel say "homicide" and "shot and killed." After defense counsel stated that he had no problem with using the word, "shot," the prosecutor stated that he would rephrase the statement to the jury, to which the court agreed. Defense counsel did not request that the jury be admonished, did not request a mistrial, nor sought any further relief from the court on this issue at that time. When back before the panel of jurors, the prosecutor withdrew his prior statement and rephrased it. The prosecutor also presented the same hypothetical to the third panel of *voir dire* and asked about self-defense.

On the following day, during the fourth panel of *voir dire*, the prosecutor again presented the same hypothetical and questioned the prospective jurors about self-defense. Defense counsel did not object.

In Sly's motion for new trial, he argued, in part, that the trial judge's rulings on several objections constituted prejudicial error. One of the challenged rulings was the trial court's "denial of defense's objection during *voir dire*, wherein the State used examples which were directly similar to the facts of the case." The trial court denied Sly's motion for new trial on July 11, 2022.

On review, as to the prosecution's hypotheticals, we disagree with defense counsel and find that the prosecution did not demand a commitment or pre-judgment from the prospective jurors. To the contrary, we find the hypothetical served to explain relevant legal principles and gauge the prospective jurors' understanding. We find the trial judge did not abuse her discretion as to this issue. *See Housely*, *supra*. Next, considering Sly's argument as to the prosecutor's

statement that defense counsel admitted his client murdered someone, we find that while defense counsel actually stated that Sly "killed," not "murdered," Webber, the record shows this issue was not properly preserved for appellate review.[24] *See State v. Matthews*, 95-1245 (La. App. 4 Cir. 8/21/96), 679 So.2d 977, 983, *writ denied*, 96-2332 (La. 1/31/97), 687 So.2d 403.

## VII. *Defense Counsel's Alleged Conflict of Interest*

Sly contends that his conviction and sentence should be vacated, and he should be granted a new trial, because he was represented by conflicted counsel, which prejudiced him, and that he never waived the conflict. Alternatively, Sly requests that the matter be remanded for an evidentiary hearing. According to Sly, during opening statements, his counsel, James Williams, indicated that he may have previously prosecuted Sly for a prior conviction in Orleans Parish in the 1980's, when he was an assistant district attorney. Sly avers that conflict-free counsel would have: (a) investigated the prior conviction and argued against its admissibility; (b) challenged Darlene Webber's statement that Sly stole property and allowed drug dealers to use their shared alleyway: (c) realized that Damon Payne was not the 9-1-1 caller and objected to admitting the call at trial; (d) reviewed court documents from the prior incident establishing that Webber was on disability and was court ordered to undergo an evaluation by JPHSA; and, (e) objected to the "acquit first" jury instructions and requested that the jury be reinstructed on justifiable homicide and the State's burden of proof.

The record reflects that during his opening statement, defense counsel stated, "As a matter of fact, and I don't mean to date myself, I believe I was the prosecutor

---

[24] While the record indicates the trial court did not explicitly rule on defense counsel's objection, by agreeing with and allowing the prosecutor to rephrase his statement, the court essentially sustained the objection and ruled in Sly's favor. However, after permitting the State to rephrase once back on the record, defense counsel failed to further object or ask for an admonition or mistrial. Accordingly, he is precluded from now complaining of an error on appeal. *State v. Favors*, 93-1034 (La. App. 5 Cir. 6/29/10), 43 So.3d 253, 261, *writ denied*, 10-1761 (La. 2/4/11), 57 So.3d 309.

in New Orleans back in the early eighties when [Sly's] case may have been there." The State argues that even if Williams was the assistant district attorney who prosecuted Sly in one or more of his prior convictions in the 1980's, Sly has failed to show how that created an actual conflict of interest for Williams thirty years later as to the instant case, or how Williams' representation prejudiced him.

Under the Sixth Amendment, a defendant is entitled to assistance of counsel for his defense. U.S. Const. Amend. VI; *State v. Walker*, 16-293 (La. App. 5 Cir. 12/14/16), 206 So.3d 474, 477, *writ denied*, 17-190 (La. 9/29/17), 227 So.3d 284. To be more than just a hollow right, assistance of counsel must be effective. *Id*. Reasonably effective assistance of counsel means that the lawyer not only possess adequate skill and knowledge, but also that he has the time and resources to apply his skill and knowledge to the task of defending each of his individual clients. *State v. Peart*, 621 So.2d 780. 789 (La. 1993). As a general rule, an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant he is representing. *Walker*, *supra*. Accordingly, the right to counsel secured under the Sixth Amendment includes the right to conflict-free representation. *Id*. (citing *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 436 (1978)).

Similarly, the Rules of Professional Conduct prohibit a lawyer from representing a client if the representation involves a concurrent conflict of interest. Rules of Professional Conduct 1.7(a); *State v. Casaday*, 51,330 (La. App. 2 Cir. 5/17/17), 223 So.3d 108, 115. Such a conflict of interest, however, is not limited to dual representation. *See* Rules of Professional Conduct 1.7(a)(2). Rule 1.11(a)(2) of the Louisiana Rules of Professional Conduct states, in part:

> [A] lawyer who has formerly served as a public officer or employee of the government … shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate

> government agency gives its informed consent, confirmed in writing, to the representation.

Rule 1.11(e) provides that the term "matter" includes:

> (1) any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties; and
> (2) any other matter covered by the conflict of interest rules of the appropriate government agency.

The time at which a conflict-of-interest issue is raised is determinative of the standard to be applied in evaluating the claim. As here, where a defendant does not raise the issue of conflict of interest until after the trial, the defendant is required to show that "an actual conflict of interest adversely affected his lawyer's performance" in order to establish a Sixth Amendment violation. *State v. Fontenelle*, 17-103 (La. App. 5 Cir. 9/13/17), 227 So.3d 875, 885. In other words, the defendant must show that he was "actually prejudiced." *Id.*

An actual conflict of interest occurs when a defense attorney is placed in a situation "inherently conducive to divided loyalties." *State v. Carmouche*, 508 So.2d 792, 797 (La. 1987). The phrase "actual conflict of interest" means "precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *State v. Kelly*, 14-241 (La. App. 5 Cir. 10/29/14), 164 So.3d 866, 879, *writ denied*, 14-2499 (La. 9/25/15), 178 So.3d 163. The inherent dilemma in conflict-of-interest situations stems from what counsel finds himself compelled to refrain from doing. *State v. Carter*, 10-614 (La. 1/24/12), 84 So.3d 499, 509, *cert. denied*, 568 U.S. 823, 133 S.Ct. 209, 184 L.Ed.2d 40 (2012). If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. *State v. Reeves*, 06-2419 (La. 5/5/09), 11 So.3d 1031, 1081, *cert. denied*, 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009). The burden of proving an actual conflict of interest, rather than a mere

possibility of a conflict, rests upon the defendant. *Walker*, 206 So.3d at 480. To show an actual conflict, a defendant must prove, through specific instances in the record, that his attorney was placed in a situation inherently conducive to divided loyalties. *Carter*, *supra*.

Although most conflict-of-interest cases involve representation of multiple defendants, a conflict of interest may arise between a single defendant and his attorney. *Fontenelle*, 227 So.3d at 886. An attorney is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial. *See Holloway*, *supra*, 435 U.S. at 485, 98 S.Ct. at 1179.

The first inquiry in the analysis of an alleged conflict of interest raised either pre-trial or post-trial, as here, is whether an actual conflict of interest existed. *Reeves*, 11 So.3d at 1082. Thus, we must determine whether the record shows that Williams had divided loyalties if he previously prosecuted Sly in Orleans parish over thirty years prior to his current representation of Sly on unrelated charges. We find that it does not. There is nothing in the record suggesting that Williams' possible prior prosecution over three decades ago in another parish would have in any way affected his representation of Sly in the instant case or that he owed any duty to an adverse party. This lack of internal friction is further supported by Williams' statement that he merely "believed" he was the prosecutor, suggesting that he could not fully recall whether he was and that he was, therefore, not influenced by it. *See State v. Kirkpatrick*, 443 So.2d 546 (La. 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). In addition, Sly was also represented at trial by a second attorney, Roger Jordan, whom he does not allege had any conflict. The record reflects that Jordan actually examined the first, second, and fourth *voir dire* panels. Jordan also cross-examined several witnesses at trial, including Darlene Webber, Damon Payne, Dr. Connor, and Skylar Sly.

Further, the record reflects that Jordan was present for all three pretrial proceedings, as well as the entire trial.

Based on our review of the record, we conclude that Sly has failed to carry his burden of proving that an actual conflict of interest existed. This assignment of error lacks merit.

## VIII. *Sly was Denied His Right to Trial by a Jury of his Peers*

Sly contends that he was denied his constitutional right to a fair trial with an impartial jury, or a jury of his peers, as there was only one black juror. In particular, Sly contends that because the record is devoid of any information regarding the composition of the petit jury venire, he is unable to determine whether or not he has a meritorious *Batson*[25] claim, and has been denied his right to a complete record and the opportunity to fully litigate this claim on appeal. Sly seeks to have this Court order that the record be supplemented to include the composition of the petit jury venire, or alternatively, that the case be remanded for an evidentiary hearing.

The State argues that Sly waived any objection to his claim that the racial composition of the petit jury venire violated his constitutional rights as he did not file a motion to quash, and that no *Batson* challenge was made or preserved for appellate review. We agree.

The selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *State v. Brown*, 18-1999 (La. 9/30/21), 330 So.3d 199, 281, *cert. denied*, -- U.S. --, 142 S.Ct. 1702, 212 L.Ed.2d 596 (2022). Pursuant to La. C.Cr.P. art. 419(A), "A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically

---

[25] *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 60 (1986).

excluded from the venires solely upon the basis of race." The burden of proof "rests on defendant to establish purposeful discrimination in the selection of grand and petit jury venires." *Id*.

The proper procedural vehicle for alleging that a jury venire was improperly drawn, selected, or constituted is a motion to quash. La. C.Cr.P. 532(9); *Patton, supra*, 355 So.3d at 178. A motion to quash based on the ground that the jury venire was improperly selected should be filed in writing prior to the beginning of jury selection. *Id*.; *State v. Holliday*, 17-1921 (La. 1/29/20), 340 So.3d 649, 691, *cert. denied*, -- U.S. --, 141 S.Ct. 1271, 209 L.Ed.2d 10 (2021).

Having thoroughly reviewed the record, we note that Sly did not file a motion to quash raising the issue that the jury venire was improperly drawn or selected, nor did he make an objection on this basis. Thus, Sly failed to preserve this issue for appellate review. *See* La. C.Cr.P. art. 841.

### IX. *Improper Introduction of Victim Impact Statement*

Sly avers he is entitled to a new trial based on the trial court's alleged improper introduction of the testimony of Darlene Webber regarding the impact Webber's death has had on her and her family. In support of his claim, Sly generally cites to the entirety of Darlene's testimony.

The State argues that Sly failed to preserve any issue with regard to alleged impermissible victim impact testimony for appellate review. The State contends that even if properly preserved, an error would be harmless.

Louisiana jurisprudence recognizes and permits during the penalty phase of capital cases, "victim impact" evidence or testimony, relating either to the individuality of the victim or the impact of the crime on the victim's survivor. *See* La. C.Cr.P. art. 905.2; *see also State v. Williams*, 96-1023 (La. 1/21/98), 708 So.2d 703, 720-22, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998). Victim impact evidence "is relevant and admissible at the penalty phase of a

capital trial in order to permit the jury to assess meaningfully defendant's moral culpability and blameworthiness," but, such evidence "generally is not used to prove essential elements of a crime." *State v. Lambert*, 98-730 (La. App. 4 Cir. 11/17/99), 749 So.2d 755, *cert. denied sub nom. State ex rel. Lambert v. State*, 00-1346 (La. 1/26/01), 781 So.2d 1258. "'Victim-impact evidence' has a highly specific meaning;" evidence not offered in the penalty phase to illustrate the impact of the crime should not be described as victim impact. *Hoffman*, *supra*, 768 So.2d at 567. While "some facts about the victim, including some personal characteristics, are frequently developed at the guilty phase of the trial (on issues such as self-defense and justification)," such evidence is not victim impact, and the admissibility of such evidence should be determined in light of its relevancy under La. C.E. arts. 401 *et seq.*

The record reveals that defense counsel made several objections throughout Darlene Webber's testimony, including objections for hearsay and leading the witness. The record does not show, however, that defense counsel made an objection to any of Darlene's testimony on the grounds that it was improper victim impact evidence. As such, we find that Sly failed to properly preserve this claim for appellate review.[26] This assignment of error is without merit.

## IX. *Denial of a Right to a Fair Trial due to the Improper Admission of Highly Prejudicial Hearsay Testimony*

Sly contends the trial court erred in allowing inadmissible hearsay testimony from Darlene Webber alleging that the dispute between Webber and Sly began because Sly took some air conditioning equipment that Webber put on the side of their house and brought it to the scrapyard. Sly argues the trial court further erred

---

[26]     Nonetheless, even if the issue was preserved, any error was surely harmless in light of the evidence presented at trial**.** *See State v. Hayes*, 17-789 (La. App. 4 Cir. 3/27/19), 315 So.2d 225, 247-248, *writ denied*, 19-808 (La. 3/9/20), 294 So.3d 485, *cert. granted*, *judgment vacated (on other grounds)*, --U.S. --, 141 S.Ct. 1040, 208 L.Ed.2d 513 (2021). The guilty verdict actually rendered at trial was surely unattributable to any error in permitting the alleged victim impact evidence. *See Frickey*, *supra*. Sly admitted to shooting Webber six times, including twice to the head after following him across the street, even though Webber did not have a gun.

in allowing hearsay testimony from Darlene that Webber "was upset that … Sly was bringing drug dealers through their shared alleyway and did not want them coming through." Sly asserts that Darlene's testimony that Webber purchased a gun because he felt like his life was in danger due to the people Sly was bringing through the alleyway was also inadmissible hearsay.

In response, the State avers that defense counsel failed to object to testimony that the relationship between the families deteriorated after Sly took equipment for scrap from the side of Webber's house. The State contends that even though several hearsay objections were sustained, defense counsel never requested that the jury be admonished. The State argues that much of the testimony to which defense counsel objected was not directly responsive to questions that were posed to Darlene. The State also contends that much of the testimony was not offered for the truth of the matter asserted and that the testimony was cumulative. Lastly, the State claims that any issue concerning hearsay testimony of Darlene that was properly preserved for appellate review was harmless and that no relief is warranted.

Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801. Hearsay evidence is not admissible except as otherwise specified in the Code of Evidence or other legislation. La. C.E. art. 802. Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. *State v. Hernandez*, 11-712 (La. App. 5 Cir. 4/10/12), 93 So.3d 615, 624, *writ denied sub nom. State ex rel. Hernandez v. State*, 12-1142 (La. 9/28/12), 98 So.3d 834.

In the instant case, Sly identifies three areas of Darlene's testimony that he claims constituted inadmissible hearsay. As to the first, the record reveals that

defense counsel did not object when Darlene testified that the relationship between Sly and Webber changed after Sly took the AC equipment from the side of the Webber home. Consequently, this issue was not preserved for appellate review. La. C.Cr.P. art. 841. *See also State v. Butler*, 15-89 (La. App. 5 Cir. 7/29/15), 171 So.3d 1283, 1289, *writ denied*, 15-1608 (La. 10/10/16), 207 So.3d 408.

As to Sly's second allegation of inadmissible hearsay, the record reflects that Darlene testified that Sly and a neighbor "were bringing like these different like -- I'm going to say drug dealers and different people" through their shared alleyway and that Webber "asked them not to bring the people through the yard." Darlene stated that Webber "says that a lot of the stuff that they bring through there -- and we have a lot of young grandkids. So they didn't want them coming through the alley because they smoke as well, like drug dealers and stuff like that." The record shows that defense counsel objected on the basis of hearsay. Before the judge made a ruling on the objection, the prosecutor responded that he would move on. When a defendant objects to the admission of testimony, it is incumbent upon him to seek a ruling from the court. *See State v. Lynch*, 94-543 (La. App. 1 Cir. 5/5/95), 655 So.2d 470, 477, *writ denied*, 95-1441 (La. 11/13/95), 662 So.2d 466. Absent a ruling by the court, or a refusal by the court to rule, there is nothing for the appellate court to review. *Id*. Because defense counsel here did not seek a ruling on his objection or further object to that line of questioning, we find there is nothing for this Court to review.

Regarding Sly's third contention, that Darlene's testimony that Webber purchased a gun because he felt like his life was in danger due to Sly bringing people through the alleyway constituted inadmissible hearsay, the record shows that Sly's counsel objected to this testimony several times, and the trial judge

sustained the objections.[27]  By sustaining the objections, Sly obtained the relief he

sought.  *See Lynch*, *supra*.  If an objection is sustained, the defendant cannot on

appeal complain of the alleged error unless at the trial level he had requested and

had been denied either a mistrial or an admonition.  *State v. Rodriguez*, 02-334 (La.

App. 5 Cir. 1/14/03), 839 So.2d 106, 136, *writ denied*, 93-0482 (La. 5/30/03), 845

So.2d 1061, *cert. denied*, 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003).

The record shows that defense counsel neither requested that the trial judge

admonish the jury to disregard any of the testimony to which she sustained an

objection, nor did counsel seek a mistrial.  Thus, any further complaint regarding

this testimony was not preserved for appellate review.  *Id*.  This assignment of

error has no merit.  *See State v. Yates*, 350 So.2d 1169, 1174 (La. 1977).

## XI.  *Unconstitutionally Excessive Sentence*

Sly argues his sentence is "unconstitutionally excessive," given that the

evidence supported a finding that he acted in self-defense and that his actions were

justified.  Sly contends the imposed mandatory life sentence should be vacated as it

is grossly out of proportion with the circumstances of this case.  The State responds

that Sly has argued no facts that support a downward deviation from his mandatory

minimum sentence of life imprisonment and, thus, no relief is warranted.

Sly was sentenced to life imprisonment at hard labor without the benefit of

parole, probation, or suspension of sentence for the conviction of second-degree

murder of Webber.  After the imposition of sentence, defense counsel objected to

the sentence.  The trial judge explained that although the life sentence was

mandatory, she reviewed the sentencing guidelines pursuant to La. C.Cr.P. art.

894.1 and reviewed all aggravating and mitigating circumstances.  She stated that

she was sentencing Sly "to the only sentence available which is life in the

---

[27]     The record also reveals that defense counsel, on cross-examination, elicited testimony from
Darlene regarding some of the same things to which he had objected as hearsay during examination by
the prosecution.

Department of Corrections at hard labor without benefit of probation, parole or suspension of sentence."

On July 27, 2022, Sly filed a motion to reconsider sentence wherein he asserted the sentence was cruel, unusual, and excessive because the State failed to prove that he intended to kill Webber. Sly argued that "[a]pplying the second most severe punishment allowed under Louisiana law to a seventy-one year old man who armed himself out of fear, and reasonably believed his actions were necessary to protect himself and his family, violates both the spirit and the intent of the ban on cruel, unusual and excessive punishments[.]" Sly contends the sentence is grossly disproportionate to his actions and serves no rehabilitative purpose. In his motion, Sly did not argue any evidence or otherwise move for a downward departure of the mandatory minimum sentence under *State v. Dorthey*, 623 So.2d 1276 (La. 1993).[28] The trial court denied Sly's motion to reconsider.

The Eighth Amendment of the United States Constitution and Article 1, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense, or imposes needless and purposeless pain and suffering. *State v. Holmes*, 12-579 (La. App. 5 Cir. 5/16/13), 119 So.3d 181, 200, *writ denied*, 13-1395 (La. 1/10/14), 130 So.3d 318. Pursuant to La. C.Cr.P. art. 881.4(D), an appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. *State v. Woods*, 20-73 (La. App. 5 Cir. 9/9/20), 303 So.3d 403, 406, *writ denied*, 21-27 (La. 2/17/21), 310 So.3d 1150. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the

---

[28] Where defendant failed to present any evidence or make any argument for a downward departure from the mandatory minimum sentence at his sentencing hearing, this Court has found that the defendant failed to carry his burden and concluded that his sentence was not excessive. *State v. Royal*, 03-439 (La. App. 5 Cir. 9/30/03), 857 So.2d 1167, 1174, *writ denied*, 03-3172 (La. 3/19/04), 869 So.2d 849.

court's sense of justice, while recognizing the trial court's wide discretion in the imposition of sentences within statutory limits. *State v. Hankton*, 20-388 (La. App. 5 Cir. 7/3/21), 325 So.3d 616, 623, *writ denied*, 21-1128 (La. 12/7/21)), 328 So.3d 425. "A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and therefore, is given broad discretion in sentencing." *Holmes*, 119 So.3d at 200. On appellate review of a sentence, the relevant inquiry is "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Aguliar-Benitez*, 21-174 (La. 10/12/21), 332 So.3d 618, 620.

Sly was convicted of second degree murder in violation of La. R.S. 14:30.1. Sly's life sentence is mandatory under La. R.S. 14:30.1(B), which provides that second degree murder is punishable by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Louisiana courts have consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. *State v. Francois*, 17-471 (La. App. 5 Cir. 3/14/18), 242 So.3d 806, 820, *writ denied*, 18-530 (La. 2/11/19), 263 So.3d 898. Moreover, it is presumed that a mandatory minimum sentence is constitutional. *State v. Vedol*, 12-376 (La. App. 5 Cir. 3/13/13), 113 So.3d 1119, 1125, *writ denied*, 13-811 (La. 11/1/13), 125 So.3d 419.

Nevertheless, even though Sly received the mandatory minimum sentence, that sentence may still be reviewed for unconstitutional excessiveness. *See State v. Temple*, 01-655 (La. App. 5 Cir. 12/12/01), 806 So.2d 697, 707, *writ denied*, 02-234 (La. 1/31/03), 836 So.2d 58. To rebut the presumption of constitutionality, the defendant must clearly and convincingly show that he is "exceptional, which … means that because of the unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and circumstances." *Vedol*,

113 So.3d at 1125. A sentencing court should exercise its authority to declare excessive a mandatory minimum sentence only under rare circumstances. *State v. Chester*, 19-363 (La. App. 5 Cir. 2/3/21), 314 So.2d 914, 993, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321.

Sly argues that his life sentence is unconstitutionally excessive because the evidence supported that he acted in self-defense, and his actions were justified. However, as previously discussed, the evidence is sufficient under the *Jackson* standard to show that Sly had specific intent to kill or inflict great bodily harm when he fired the gun and shot Webber, who was unarmed, six times, and the evidence negated Sly's claims of self-defense.

On review, we find that Sly has argued no facts to rebut the presumption that the mandatory sentence is constitutional nor does he present any convincing evidence to support a downward deviation from his mandatory life sentence. Considering the totality of the facts and circumstances of this case, we find the record does not support the conclusion that Sly's sentence makes no measurable contribution to acceptable goals of punishment, that it is nothing more than the purposeless imposition of pain and suffering, that it is grossly out of proportion to the severity of the crime, or that the sentence shocks the sense of justice when the crime and punishment are considered in light of the harm done to society. We conclude that Sly's mandatory sentence at hard labor for second degree murder is not unconstitutionally excessive. This assignment of error lacks merit.

### XII. *Denial of Motion to Suppress Sly's Statement*

Sly gave three statements on the evening of the shooting—two at the scene to Sergeant Melle, and one at the crime bureau to Detective Buttone (and Detective Fricke), where he was interrogated over a period of five hours. Sly argues his statement(s) should have been suppressed and that he is entitled to a new trial because he was not free to leave or call his wife, and that at his age, the stress of

the incident, his concern for the safety of his wife and family, and the pressure and stress of being isolated from his family, all combined to overcome his free will and compel him to speak to officers. The State argues that Sly's first statement given to Sergeant Melle at the scene was spontaneous and voluntary. Sly was advised of his rights and waived them before speaking to Sergeant Melle, and then again to Detective Buttone at the criminal investigation bureau. The State claims Sly testified that he was not forced or threatened to give a statement and that he was advised that he could have an attorney. The State concludes that Sly's will was not overcome and that his confession was the product of rational intellect and free will.

A defendant bears the burden of asserting the basis for his motion to suppress in order to give the State adequate notice so that it may present evidence and address the issue. *State v. Lobo*, 11-51 (La. App. 5 Cir. 10/25/11), 77 So.3d 427, 436, *writ denied*, 11-2586 (La. 3/30/12), 85 So.3d 117. As previously stated, La. C.Cr.P. art. 841(A) provides that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." Articulating a new basis for the motion to suppress for the first time on appeal is prohibited under La. C.Cr.P. art. 841, since the trial court would not be afforded an opportunity to consider the merits of the particular claim. *State v. Berroa-Reyes*, 12-581 (La. App. 5 Cir. 1/30/13), 109 So.3d 487, 496. Louisiana courts have long held that a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise in the trial court in a motion to suppress. *Id.*

On June 19, 2020, defense counsel filed an omnibus motion, which included a "motion to suppress confession, identification, and physical evidence." The suppression motion was generic and not tailored to the particular facts of this case. The portion of Sly's motion pertaining to suppressing the statement provides:

> All inculpatory statements and/or confessions to be used
> against the defendant by the State in this matter were
> obtained unlawfully and illegally because:

1. They were not made to police officers or to anyone else freely and voluntarily, but were made under the influence of fear, intimidation, threats or other duress, or because of promises or other inducements; and/or

2. Defendant had not been advised of his rights under Miranda, or had invoked his right to remain silent or to have an attorney and this right had not been honored.

A hearing on Sly's motion to suppress was held on October 1, 2020. Sergeant Melle and Detective Buttone both testified. Each separately testified that Sly was advised of his rights, that Sly indicated he understood his rights, and that Sly freely waived them. Each stated that at no point was Sly threatened, forced, coerced, or promised anything in exchange for his statement, and that Sly discussed what happened freely and voluntarily. At the hearing, the State argued that Sly was advised of his *Miranda* rights three times and knowing and intelligently waived his rights. Defense counsel did not present an argument at the hearing. The judge denied Sly's motion to suppress the three statements.

On appeal, Sly is articulating a new basis for suppressing the statements. In his motion to suppress, Sly presented two generic grounds, and did not present any argument at the hearing. Here, he argues that this free will was overcome because of his age, stress, concern for his family, and his inability to call his wife. Accordingly, we find that pursuant to La. C.Cr.P. art. 841, Sly is prohibited from presenting this new basis for suppressing the statements for the first time on appeal and is not entitled to relief.

### XIII. *Denial of His Right to a Complete Record*

In this assignment of error, although Sly does not request specific relief, he asserts the appellate record is incomplete in that it does not contain the following:

- A pre-trial defense motion requesting a special jury instruction. A note on the proposed order indicates the motion was not done in open court.

- An objection and ruling thereon (which occurred during a bench conference) during the testimony of Detective Zanotelli.

- A bench conference occurring during Skylar Sly's testimony was not transcribed.

The State argues that, with respect to defense counsel's request for a special jury instruction, the record indicates the trial court denied the request. With regard to the preliminary instructions given to the jury, the State argues Sly has not established that the instructions were not recorded or that he was prejudiced by their omission from the record. As to the alleged untranscribed objection and ruling, the State explains that the objection was made in the afternoon and the trial judge's ruling the following morning was not recorded. The State alleges that while the ruling was not recorded, the parties revisited the issue later that same day when the prosecutor sought to question Detective Zanotelli whether, in booking Sly, he found any evidence that Sly acted in self-defense. Further, the State contends that in a bench conference, defense counsel asserted that the question was a direct violation of the trial court's ruling. Regarding Sly's contention that a bench conference during Skylar's testimony was not recorded, the State argues Sly has failed to show that he was prejudiced by the failure to record and/or transcribe it. The State concludes that Sly is not entitled to relief as he has failed to establish that he was prejudiced by the minor omissions. We agree.

Louisiana Constitution article I, § 19 guarantees defendants a right of appeal based upon a complete record of all evidence upon which the judgment is based. Additionally, in felony cases, the clerk or court stenographer shall record all of the proceedings, including the examination of witnesses, statements, rulings, orders and charges by the court, and objections, questions, statements, and arguments of counsel. La. C.Cr.P. art. 843. The Article 843 reference to "objections" and "arguments" generally only applies to objections made in open court and the

arguments of counsel in closing, because only those objections and arguments rise to a level of materiality sufficient to invoke Article 843. *See State v. Coleman*, 21-870 (La. App. 1 Cir. 4/8/22), 342 So.3d 7, 16. Similarly, the reference in La. Const. art. I, § 19 to record evidence does not encompass bench conferences that do not satisfy the materiality requirements of Article 843. *Id.* Also, La. R.S. 13:961(C) states, in part, that in criminal cases tried in the judicial districts, the court reporter "shall record all portions of the proceedings required by law or the court and shall, when required by law or the court, transcribe those portions of the proceedings required, which shall be filed with the clerk of court in the parish where the case is being tried."

A defendant has a right to a complete transcript of the trial proceedings, particularly where, as here, appellate counsel did not represent defendant at trial. *See State v. Norman*, 18-723 (La. App. 5 Cir. 12/18/19), 287 So.3d 778, 786, *writ denied, cause remanded*, 20-109 (La. 7/2/20), 297 So.3d 738, *writ denied*, 20-109 (La. 2/17/21), 310 So.3d 1149. Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal require reversal; however, a slight inaccuracy in a record or an inconsequential omission from it, which is immaterial to a proper determination of the appeal, does not require reversal of a conviction. A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcript. *See e.g.*, *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, 773, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); *State v. Spears*, 18-663 (La. App. 5 Cir. 12/11/19), 286 So.3d 1064, 1099. "The materiality of a given omission is measured by the prejudicial effect of the omission on the defendant in accessing the full scope of appellate review[.]" *State v. Clark*, 19-518 (La. App. 5 Cir. 6/24/20), 296 So.3d 1281, 1289, *writ denied*, 21-62 (La. 3/9/21), 312 So.3d 585.

Further, there exists a presumption of regularity in judicial proceedings. *State v. Hawkins*, 96-766 (La. 1/14/97), 688 So.2d 473, 480.

"The party making the motion for appeal shall, at the time the motion is made, request the transcript of that portion of the proceedings necessary in light of the assignment of errors to be urged." La. C.Cr.P. art. 914.1(A). "A transcript of any portion of the proceedings which does not relate to anticipated assignment of errors shall not be furnished to a party for purposes of appeal." La. C.Cr.P. art. 914.1(B). The appellant bears the burden of furnishing the appellate court with a record of the trial proceedings needed for review; and therefore, any inadequacy of the record is imputable to the appellant. *State v. Beckley*, 18-386 (La. App. 5 Cir. 5/8/19), 273 So.3d 503, 514, *writ denied*, 19-1003 (La. 12/10/19), 285 So.3d 490.

In the instant case, Sly's motion for appeal states, "Further, pursuant to La. C.Cr.P. art. 914.1(A), the defendant respectfully designates the entire transcript of each hearing herein, including the transcription of the Voir Dire and all of the pleadings, for inclusion in the appellate record." Sly now asserts that the record is missing a transcript regarding a motion requesting a special instruction based on a note on the order that it was not done in open court. Sly has failed to demonstrate that a hearing on the motion actually occurred. Further, Sly did not request that transcripts of the initial jury instructions or the bench conferences be included in the record on appeal. On review, we find that Sly has not demonstrated or particularized how he has been prejudiced by the alleged inconsequential omissions from the trial transcript. Additionally, we find the appellate record does not contain any material omissions that would deny Sly a complete appellate review, nor is the record so lacking that any of the preserved assignment of errors presented on appeal could not be addressed. This assignment of error lacks merit.

**XIV.** *Alleged Impartiality of the Trial Judge Denied Sly His Right to a Fair Trial*

Sly alleges the trial judge's impartiality might reasonably be questioned. In support, Sly contends the trial judge (a) interrupted defense counsel's questioning during *voir dire* without objection by the State; (b) allowed the State to *voir dire* on hypothetical questions that committed jurors to rejecting self-defense and convicting of second degree murder; (c) interrupted defense counsel's questioning of a witness with no objection by the State; (d) accused defense counsel of threatening and yelling at her when, in fact, he was making an objection; and (e) failed to issue an instanter subpoena when a defense witness failed to appear at trial. Sly argues that "on the basis of all the circumstances," he is entitled to a new trial presided over by an impartial judge.

The State responds that Sly never moved for the trial judge's recusal and, thus, this error is waived. The State avers that, presuming the claim was preserved, except for the State's hypotheticals during *voir dire* (addressed in section VI, *supra*), Sly did not preserve any of the underlying allegations for review with a contemporaneous objection. Nonetheless, the State argues Sly has not established bias, prejudice, or personal interest on the part of the trial judge.

A trial judge is presumed to be impartial, and the burden is on the party seeking to recuse a judge to prove otherwise. *State v. Gatewood*, 12-281 (La. App. 5 Cir. 10/30/12), 103 So.3d 627, 637. The grounds for recusal based on bias, prejudice, or personal interest must amount to more than conclusory allegations. *State v. Galliano*, 05-962 (La. App. 5 Cir. 8/29/06), 945 So.2d 701, 727-28, *writ denied*, 06-2367 (La. 4/27/07), 955 So.2d 682. While trial judges "have a duty to remain impartial and neutral, judges are not merely umpires or moderators." *State v. Baldwin*, 388 So.2d 679, 686 (La. 1980). Rather, a trial judge "is charged to see

that the law is properly administered, and it is a duty which he can not [sic]

discharge by remaining inert." *Id.* at 687-88.

The grounds for recusing a judge are outlined in La. C.Cr.P. art. 671, and the

procedure for doing so is set forth in La. C.Cr.P. art. 674. Article 674(A) states:

> A party desiring to recuse a trial judge *shall file a written motion* therefor assigning the ground for recusal under Article 671. The motion shall be filed *not later than thirty days after discovery of the facts* constituting the ground upon which the motion is based, but in all cases at least thirty days prior to commencement of the trial. In the event that the facts constituting the ground for recusal occur thereafter or the party moving for recusal could not, in the exercise of due diligence, have discovered such facts, the motion to recuse *shall be filed immediately after the facts occur or are discovered, but prior to verdict or judgment*. [Emphasis added.]

In the instant case, it is first noted that Sly failed to move for recusal of the

trial judge at any point. Pursuant to La. C.Cr.P. art. 674(A), Sly was required to

file a written motion to recuse the judge immediately after the facts occurred or

were discovered, but prior to verdict or judgment. Because Sly failed to do so, he

waived appellate review of this alleged error. La. C.Cr.P. arts. 671 and 674; *See*

*State v. Howard*, 01-5 (La. App. 5 Cir. 4/24/01), 786 So.2d 174, 183.

Even assuming Sly preserved the issue, on review, we note there is nothing

in the record to support that the trial judge was biased, prejudiced, or had a

personal interest in the cause based on the allegations made by Sly. Further, we

found nothing to suggest the trial judge was unable to conduct a fair and impartial

trial for any other reason. Having concluded that the issue was not properly

preserved, or, even if it was, that the record does not suggest any bias or prejudice

by the trial judge, we find this assigned error to be without merit.

### XV. *Cumulative Impact of Errors Mandate a New Trial*

In his final assignment of error, Sly alleges that the cumulative impact of all

of the errors previously addressed violated his right to due process and entitles him

to a new trial.  The State responds that Sly failed to show any errors, much less

cumulative error, and that the Supreme Court has found that aggregate harmless

errors do not constitute reversible error.  We agree.

Despite thorough review of the record, and each of Sly's assignments of

error, we find no reversible error.  This Court has previously held that the

combined effect of assignments of error, none of which warrant reversal on its

own, does not deprive a defendant of his constitutional right to a fair trial.  *State v.*

*Seals*, 09-1089 (La. App. 5 Cir. 12/29/11), 83 So.3d 285, 354, *writ denied*, 12-293

(La. 10/26/12), 99 So.3d 53, *cert. denied*, 569 U.S. 1031, 133 S.Ct. 2796, 186

L.Ed.2d 863 (2013).  *See also State v. Holliday*, *supra*, 340 So.3d at 714.  The

Louisiana Supreme Court has continuously rejected cumulative error arguments

and, instead, found that harmless errors, however numerous, do not aggregate to

reach the level of reversable error.  *Id*.  This Court did not find any substantive

error in the trial court proceedings and, consequently, no cumulative error

warranting reversal exists.  This assignment of error is without merit.

**ERRORS PATENT REVIEW**

The record was review for errors patent, according to La. C.Cr.P. art. 920,

*State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175

(La. App. 5 Cir. 1990).  We find no errors patent requiring corrective action.

**CONCLUSION**

Accordingly, for the foregoing reasons, we affirm Sly's conviction and

sentence.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**NOVEMBER 2, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-60

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          CAROL ANNE KOLINCHAK (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053